UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

Wendy Drews

_____

Write the full name of each plaintiff.

24 cv 6697- LLS

(Include case number if one has been assigned)

-against-

Gold Oller Real Estate Investments
Lynmark Group-Orange Avenue
Apartments, LLC d/b/a The Sheldon
at Suffern Station, Carla Hines-Melcher, et al.

Write the full name of each defendant. If you need more space, please write "see attached" in the space above and attach an additional sheet of paper with the full list of names. The names listed above must be identical to those contained in Section II.

**AMENDED COMPLAINT**

Do you want a jury trial?
☑ Yes    ☐ No

RECEIVED
SDNY PRO SE OFFICE
2025 AUG 27  PM 3:59

---

**NOTICE**

The public can access electronic court files. For privacy and security reasons, papers filed with the court should therefore *not* contain: an individual's full social security number or full birth date; the full name of a person known to be a minor; or a complete financial account number. A filing may include *only*: the last four digits of a social security number; the year of an individual's birth; a minor's initials; and the last four digits of a financial account number. See Federal Rule of Civil Procedure 5.2.

Rev. 1/3/17

## I.   BASIS FOR JURISDICTION

Federal courts are courts of limited jurisdiction (limited power). Generally, only two types of cases can be heard in federal court: cases involving a federal question and cases involving diversity of citizenship of the parties. Under 28 U.S.C. § 1331, a case arising under the United States Constitution or federal laws or treaties is a federal question case. Under 28 U.S.C. § 1332, a case in which a citizen of one State sues a citizen of another State or nation, and the amount in controversy is more than $75,000, is a diversity case. In a diversity case, no defendant may be a citizen of the same State as any plaintiff.

What is the basis for federal-court jurisdiction in your case?

☑   Federal Question

☐   Diversity of Citizenship

### A.   If you checked Federal Question

Which of your federal constitutional or federal statutory rights have been violated?

_Fair Credit Reporting Act 15 U.S.C §1681; Fair Housing Act, 42 U.S.C. § 3601 et seq; Civil Rights Act, 42 U.S.C. §1983; Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962_

### B.   If you checked Diversity of Citizenship

1.   Citizenship of the parties

Of what State is each party a citizen?

The plaintiff, _____ , is a citizen of the State of
                    (Plaintiff's name)

_____

(State in which the person resides and intends to remain.)

or, if not lawfully admitted for permanent residence in the United States, a citizen or subject of the foreign state of

_____

If more than one plaintiff is named in the complaint, attach additional pages providing information for each additional plaintiff.

If the defendant is an individual:

The defendant, _____, is a citizen of the State of

(Defendant's name)

_____

or, if not lawfully admitted for permanent residence in the United States, a citizen or subject of the foreign state of

_____

If the defendant is a corporation:

The defendant, _____, is incorporated under the laws of

the State of _____

and has its principal place of business in the State of _____

or is incorporated under the laws of (foreign state) _____

and has its principal place of business in _____

If more than one defendant is named in the complaint, attach additional pages providing information for each additional defendant.

## II.  PARTIES

### A.  Plaintiff Information

Provide the following information for each plaintiff named in the complaint. Attach additional pages if needed.

_Wendy_____ _M_____ _Drews_____
First Name                   Middle Initial      Last Name

_ACP 7037 P.O. Box 1110_____
Street Address

_Albany County_ _Albany_____ _New York_____ _12201 - 1110_____
County, City                  State                Zip Code

_(848) 925-0307_____     _wendydrewsphotography@gmail.com_
Telephone Number              Email Address (if available)

**B.   Defendant Information**

To the best of your ability, provide addresses where each defendant may be served. If the correct information is not provided, it could delay or prevent service of the complaint on the defendant. Make sure that the defendants listed below are the same as those listed in the caption. Attach additional pages if needed.

Defendant 1:    GoldOller Real Estate Investments

First Name                                      Last Name

4 Executive Boulevard

Current Job Title (or other identifying information)

Ofc

Current Work Address (or other address where defendant may be served)

Suffern               N.y.              10901

County, City                    State                Zip Code

Defendant 2:    LynMark Group - Orange Avenue Apartments, LLC.

First Name                                      Last Name

d/b/a The Sheldon at Suffern Station

Current Job Title (or other identifying information)

4 Executive Boulevard, Suite 200

Current Work Address (or other address where defendant may be served)

Suffern               N.y.              10901

County, City                    State                Zip Code

Defendant 3:    Carla        Hines - melcher

First Name                                      Last Name

Property Manager

Current Job Title (or other identifying information)

92 Blauvelt Way ~~Apt.~~

Current Work Address (or other address where defendant may be served)

Suffern               N.y.              10901

County, City                    State                Zip Code

Page 4

Defendant 4:

_____    _____
First Name                           Last Name

_____
Current Job Title (or other identifying information)

_____
Current Work Address (or other address where defendant may be served)

_____    _____    _____
County, City                 State                Zip Code

## III. STATEMENT OF CLAIM

Place(s) of occurrence: Suffern New York - The Sheldon at Suffern Station (Orange Avenue Apartments) Rockland County

Date(s) of occurrence: "2019 through present (continuing); including May 31, 2023

FACTS: (warrantless entry and removal of Plaintiff's minor son.)"

State here briefly the FACTS that support your case. Describe what happened, how you were harmed, and what each defendant personally did or failed to do that harmed you. Attach additional pages if needed.

"See attached Second Amendment Complaint"

**INJURIES**

If you were injured as a result of these actions, describe your injuries and what medical treatment, if any, you required and received.

"See attached Second Amendment Complaint"

**IV. RELIEF**

State briefly what money damages or other relief you want the court to order.

" See attached Second Amendment Complaint"

## V.   PLAINTIFF'S CERTIFICATION AND WARNINGS

By signing below, I certify to the best of my knowledge, information, and belief that: (1) the complaint is not being presented for an improper purpose (such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation); (2) the claims are supported by existing law or by a nonfrivolous argument to change existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Federal Rule of Civil Procedure 11.

I agree to notify the Clerk's Office in writing of any changes to my mailing address. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case

Each Plaintiff must sign and date the complaint. Attach additional pages if necessary. If seeking to proceed without prepayment of fees, each plaintiff must also submit an IFP application.

| | |
|---|---|
| 8/27/2025 | _Wendy Dress_ |
| Dated | Plaintiff's Signature |
| Wendy    M | Dress |
| First Name    Middle Initial | Last Name |
| ACP 7037 P.O. Box 1110 | |
| Street Address | |
| Albany County, Albany | New York    12201-1110 |
| County    City | State    Zip Code |
| (845) 925-0307 | wendydressphotography@gmail.com |
| Telephone Number | Email Address (if available) |

I have read the Pro Se (Nonprisoner) Consent to Receive Documents Electronically:

☑ Yes    ☐ No

> If you do consent to receive documents electronically, submit the completed form with your complaint. If you do not consent, please do not attach the form.

**United States District Court**
**Southern District of New York**

WENDY MARIE DREWS, *Plaintiff*,
v.
GOLDOLLER REAL ESTATE INVESTMENTS;
LYNMARK GROUP–ORANGE AVENUE APARTMENTS, LLC d/b/a The Sheldon at Suffern Station;
and CARLA HINES-MELCHER, *Defendants*.

Case No. 24-CV-6697 (LLS)

**SECOND AMENDED COMPLAINT** (Jury Trial Demanded)

# I. INTRODUCTION

1. This is a civil action arising from a multi-year pattern of harassment, discrimination, retaliation, and constitutional violations perpetrated by Defendants, in concert with law enforcement, school district officials, and politically connected stakeholders, culminating in the unlawful, warrantless removal of Plaintiff's minor son from her home on May 31, 2023, and followed by ongoing acts of intimidation and retaliation into 2025.

2. Plaintiff notes that related litigation before Judge Nelson S. Roman in the Southern District of New York is limited to claims arising solely from the events of May 31, 2023. That proceeding does not address the years of harassment, discrimination, retaliation, and coordinated misconduct by Defendants and their associates while Plaintiff was a resident at The Sheldon at Suffern Station. This Second Amended Complaint sets forth the broader factual history beginning in 2019 necessary to establish Defendants' motive, the existence of a conspiracy with police, and the premeditation leading to the May 31, 2023 incident.

3. Plaintiff further notes that Judge Laura Taylor Swain presides over separate litigation involving the local school district and a federal RICO action filed by Plaintiff. Those matters address broader patterns of misconduct involving certain individuals and entities, but they do not encompass the Fair Credit Reporting Act claims, Fair Housing Act claims, or § 1983 joint-action claims asserted in this case.

# II. JURISDICTION AND VENUE

4. This Court has jurisdiction under 28 U.S.C. § 1331 because Plaintiff's claims arise under the Constitution and laws of the United States, including the Fair Credit Reporting Act (15 U.S.C. § 1681 *et seq.*), the Civil Rights Act (42 U.S.C. § 1983), the Fair Housing Act (42 U.S.C. § 3601 *et seq.*), and the Racketeer Influenced and Corrupt Organizations Act (18 U.S.C. § 1961 *et seq.*).

Page 1 of 22

This Court also has jurisdiction under 28 U.S.C. § 1343(a)(3) because Plaintiff seeks to redress the deprivation of civil rights under color of state law.

5. The Court has supplemental jurisdiction under 28 U.S.C. § 1367 over any state law claims that are part of the same case or controversy as the federal claims herein.

6. Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events and omissions giving rise to these claims occurred in Rockland County, New York, which is within the Southern District of New York. Additionally, Defendants conduct business in this District.

# III. PARTIES

7. Plaintiff **Wendy Marie Drews** is an adult citizen of the State of New York and, at all times relevant, was a tenant of the apartment complex known as "The Sheldon at Suffern Station" located in Suffern, New York. Plaintiff is a documented domestic violence survivor and a participant in New York's Address Confidentiality Program.

8. Defendant **GoldOller Real Estate Investments** (named in the original pleadings as "Goldollar Real Estate Investments") is a real estate investment company and, upon information and belief, an owner or principal investor in The Sheldon at Suffern Station. GoldOller has its headquarters or significant business operations in Pennsylvania and conducts business in New York, including ownership and management interests in the property at issue.

9. Defendant **Lynmark Group–Orange Avenue Apartments, LLC**, doing business as **The Sheldon at Suffern Station**, is a New York limited liability company that owned and/or managed the apartment complex where Plaintiff resided. Lynmark Group is responsible for the operation of The Sheldon at Suffern Station and employed staff and agents who interacted with tenants, including Plaintiff.

10. Defendant **Carla Hines-Melcher** was, at all relevant times, the property manager of The Sheldon at Suffern Station and an agent of GoldOller and Lynmark. In that capacity, Hines-Melcher oversaw day-to-day management of the property, interacted with residents, and had authority over building access and tenant relations.

11. Plaintiff's adult children, while directly impacted by some of the events described herein, are not named as co-plaintiffs in this action. Plaintiff expressly reserves on their behalf any and all rights to seek relief in their own capacity for injuries they have suffered. Nothing in this Complaint is intended to waive or prejudice those potential claims.

# IV. FACTUAL BACKGROUND

**A. Background and Prior Real Estate Fraud**

Amendment Continued from page 1

page 2 of 22

12. Before moving to The Sheldon at Suffern Station, Plaintiff was the victim of a fraudulent deprivation of her prior home. Specifically, Plaintiff's cooperative apartment was illegally taken from her under the false pretense that it was "abandoned," despite her continued occupancy. This real estate fraud involved individuals connected to **Michael Klein**, a now-disbarred town of Ramapo attorney who had been banned by the SEC for involvement in municipal bond and securities fraud. Upon information and belief, Michael Klein and his associates have direct connections to the ownership and management of The Sheldon at Suffern Station, including being relative or business partners of parties involved in the events of this case. This prior property theft set the stage for Plaintiff's vulnerability and is part of the pattern of retaliatory conduct described herein. *(See Exhibit __)*

## B. Harassment by Greg Weiss and Police Betrayal (2019–2021)

13. In 2019, while residing at The Sheldon at Suffern Station, Plaintiff and her family were subjected to severe harassment by a neighboring tenant, **Greg Weiss.** Weiss's conduct included intimidation, threats, and disturbances that caused Plaintiff to fear for her safety and that of her children. By late 2020, the harassment had escalated to the point that a Suffern Police officer (Officer "Adams") urged Plaintiff to sign a criminal complaint against Weiss. Weiss was in fact arrested on or about December 20, 2020 and subsequently evicted from the building on or about January 8, 2021. *(See Exhibit __ for records of Weiss's arrest and eviction.)*

14. Despite Weiss's arrest and removal, Plaintiff later discovered that the record of his arrest was sealed by local authorities. This sealing of the record prevented Plaintiff from using proof of Weiss's misconduct in later proceedings (such as in family court or in defense of her custodial rights after her son's removal). The sealing of the Weiss arrest a critical piece of evidence validating Plaintiff's concerns left her without crucial documentation when opposing parties later painted her complaints as unfounded.

## C. Ignored Warnings and High-Profile Protection

15. Prior to Greg Weiss's eviction, Plaintiff had given Defendant Hines-Melcher a written list of individuals whom Plaintiff regarded as potential threats or to be avoided for safety reasons a list that explicitly included **Greg Weiss.** Plaintiff, as a domestic violence survivor, was proactive in informing management of her safety concerns. Despite this warning, Hines-Melcher and management took no effective action to protect Plaintiff. Weiss was allowed to remain in the building and was even observed violating building policies (including allowing unauthorized persons to reside in or frequent his apartment) without timely intervention. The management's failure to heed Plaintiff's warning contributed to the continuation of Weiss's harassment.

16. After Weiss's eventual eviction in January 2021, Plaintiff noticed that **Walt Weiss** (upon information and belief, a relative of Greg Weiss) began appearing on the property, even using Greg Weiss's former parking spot. When Plaintiff raised concerns about unfamiliar individuals and improper use of parking spaces, Hines-Melcher dismissed these concerns. Around this time, high-profile community members seemed to rally around the Weiss name for example, the local school district named a baseball field after Walt Weiss, suggesting he had influential

Amendment continued from page 2

Page 3 of 22

support. Plaintiff perceived these developments as signaling that the individuals who had harassed her were being protected or even honored, further intimidating her.

17. Plaintiff also experienced related acts of intimidation by other individuals around the property. For instance, a man known to Plaintiff as **Mike Masari** (known to be associated with Greg Weiss and NYS Division of Human Rights) engaged in behavior that frightened Plaintiff. On one occasion, Plaintiff observed an acquaintance of Weiss referred to here as **"Nicole S."**, loitering in the parking deck after Plaintiff questioned Hines-Melcher about irregularities in parking assignments. Rather than address Plaintiff's safety concerns, Hines-Melcher again dismissed them. These incidents reinforced Plaintiff's impression that management and its associates were unresponsive to, or possibly complicit in, the threats to her safety.

### D. First Human Rights Complaint – District Attorney Interference

18. In 2021, frustrated by the lack of protection and the harassment she had endured (particularly from Greg Weiss and others), Plaintiff filed a formal complaint with the New York State Division of Human Rights (**DHR**), detailing harassment and retaliation she experienced at The Sheldon. This first Human Rights complaint (DHR Case No. **[xxxxxxx]**) specifically addressed the conduct of Greg Weiss and the failure of management to take appropriate action. During the pendency of this complaint, Plaintiff was informed by DHR staff that the Rockland County District Attorney, **Tom Walsh III**, had personally intervened and directed the DHR to discontinue its investigation into Plaintiff's claims, allegedly stating that "the county can't help you." The Human Rigrs division to me he was a stakeholder. Plaintiff's DHR case was subsequently dropped without relief. *(See Exhibit __ for DHR correspondence.)* Plaintiff later learned that District Attorney Walsh's office had ties to individuals connected to Defendants, raising concerns that the dismissal of her Human Rights complaint was influenced by improper political or personal motives.

### E. Second Human Rights Complaint – Housing Discrimination and Retaliation

19. In late 2022 or early 2023, as the events described below were unfolding, Plaintiff filed a second complaint with the New York State Division of Human Rights this time alleging housing discrimination and unlawful retaliation by Defendants Hines-Melcher, GoldOller, and the Lynmark Group. This second Human Rights complaint detailed how Plaintiff was being treated unfairly in her housing situation because of her status as a domestic violence survivor and a single mother, and in retaliation for her having made complaints (including her prior DHR filing and other grievances). Plaintiff submitted evidence of harassment, disparate treatment, and attempts to force her out of her apartment. However, upon filing at the DHR's Bronx office (1 Fordham Plaza), Plaintiff was told that the agency **"would not assist her,"** despite the documented evidence she provided. The abrupt refusal to act on this second complaint came as a shock to Plaintiff. Shortly thereafter, Plaintiff was informed that an official involved in the DHR process had a potential conflict of interest (including personal financial ties to entities associated with Defendants), and that high-ranking county officials did not want the case to proceed. Ultimately, the second Human Rights complaint was set to be terminated and closed without meaningful investigation or relief. *(See Exhibit __ for DHR filing and closure documentation.)*

Amendment Continued from page 3                                    Page 4 of 22

### F. School District False Reporting and Identity Falsification ("Mrs. Davis" Incident)

20. On December 25, 2019, Plaintiff discovered a former self-defense instructor from her college days (SUNY) outside her residence. In the course of prior conversations with this instructor, Plaintiff had confided in her about her past trauma and,mentioned that others tried to turn her into "**Mrs. Davis**" rather than help.  Not long after this Christmas Day encounter, Plaintiff began to suspect that this individual might have shared information about her (including the false name "Mrs. Davis") with others connected to the events at The Sheldon. One district case shows the incorrect name as Mrs: Davis.

21. Upon information and belief, this former instructor is associated with **Arco Wentworth Management Company**, an entity tied to the ownership of The Sheldon at Suffern Station, and is linked to the private security firm that monitors the building's surveillance cameras. (The Sheldon's security system included cameras covering all entrances, exits, elevators, and even the mailroom and garbage areas, and an Arco Wentworth affiliate was responsible for managing this surveillance.) The unusual involvement of a person privy to Plaintiff's personal history in the building's security operations raised alarms for Plaintiff, suggesting that sensitive information about her was being circulated among Defendants' network.

22. On May 18, 2023, the local school district (Suffern Central) filed a **false Child Protective Services (CPS) report**against Plaintiff, alleging concern for the welfare of Plaintiff's son. This report was made without legitimate basis and, upon investigation by Rockland County Department of Social Services (DSS), was deemed unfounded DSS closed the case on May 24, 2023 as unsubstantiated. Notably, during the period of these false allegations, the name "Wendy Davis" (the same alias that Plaintiff had given to her self-defense instructor) surfaced in official communications and court documents related to Plaintiff's family. Plaintiff believes that the use of the incorrect name "Davis" was a deliberate effort by conspirators to misidentify her and portray her as someone she is not in effect, to fit her into a "textbook case" profile of mental instability or unfitness. This falsification and spread of an alias known only to a few individuals underscores the coordinated nature of the retaliation: personal information (even false information) about Plaintiff was weaponized by Defendants' associates to interfere with her family life and legal rights.

### G. Stakeholder Conflicts and Compromised Oversight

23. Throughout 2022 and 2023, Plaintiff came to learn of disturbing conflicts of interest suggesting that those in local government who should have helped her were instead aligned with Defendants. Notably, Rockland County Executive **Ed Day** and District Attorney **Tom Walsh III** both high-ranking public officials have close personal or financial ties to the entities associated with The Sheldon at Suffern Station. Ed Day had appeared at public events promoting the property and, as Plaintiff later discovered, even held an investment interest in businesses connected to Defendants. The **Suffern Police Department** (whose officers were involved in the incident on May 31, 2023) and the local **school district** (which filed false reports against Plaintiff) are themselves stakeholders in or closely connected to the management of The Sheldon. On information and belief, even the hospital that treated Plaintiff during a medical crisis

(discussed below) has administrative or board members with ties to Defendants' real estate enterprise. These entanglements created a situation where local authorities who should have been neutral or protective of Plaintiff's rights were compromised. Indeed, Plaintiff's serious allegations and pleas for help were repeatedly brushed aside by agencies and officials who had overlapping interests with Defendants. *(Exhibit __ contains documentation of these conflicts, including public records and correspondence.)* Plaintiff alleges that these stakeholder relationships resulted in a de facto protection racket for Defendants, enabling them to act with impunity against her without fear of local government intervention.

### H. Retaliatory Eviction and ERAP Protections

24. In late 2022, Plaintiff's financial situation deteriorated due in part to the ongoing harassment and related legal battles. She applied for and was approved to receive rental assistance through New York's Emergency Rental Assistance Program (**ERAP**), a federally-funded program that provided relief to tenants during the COVID-19 pandemic. By law, Plaintiff's ERAP approval (effective on or about November 2022) placed a stay on any eviction proceedings and conferred certain protections including the right to seek a further stay of eviction if a minor child resided in the household. Defendants were aware that Plaintiff had no employment income at that time and that she was relying on ERAP and other assistance to maintain housing for herself and her children.

25. Notwithstanding these protections, Defendants moved to terminate Plaintiff's tenancy and evict her at the earliest opportunity. As soon as Plaintiff's ERAP coverage was paid and after paying the $4.200 of additional charges ERAP didn't cover or about March 7, 2023. Defendants refused to renew her lease and initiated steps to remove her from the apartment. Upon information and belief, this eviction decision was made in retaliation for Plaintiff's prior complaints, lawsuits, and the Human Rights filings described above in other words, it was not a typical business decision, but a punitive measure. Plaintiff's eviction was carried out in or around Spring 2024, thereby stripping Plaintiff of physical possession of her home. Even after Plaintiff and her children were forced out of their apartment, Defendants continued to use their control over the building (keys, access devices, surveillance cameras, and coordination with on-site personnel) to monitor Plaintiff's comings and goings and to set the stage for the events of May 31, 2023.

26. Had Plaintiff been given a fair opportunity, she could have sought court intervention to prevent the loss of her housing and to protect her minor son's stability. Indeed, under New York law, courts may stay an eviction or otherwise accommodate tenants with active ERAP assistance or other hardships especially where a child's welfare is at stake. However, Defendants' aggressive actions and ongoing intimidation tactics effectively prevented Plaintiff from accessing the court process in time to save her tenancy. This **retaliatory eviction** directly facilitated the subsequent unlawful removal of Plaintiff's child: once Plaintiff was no longer a tenant, Defendants had freer access to the apartment and could more easily assist police in entering the unit without Plaintiff's consent. The eviction and its surrounding circumstances form an integral part of the conspiracy alleged in this case, as they demonstrate how Defendants'

Amendment continued from page 5

Page 6 of 22

pattern of retaliation and collusion with authorities stripped Plaintiff of both her home and her ability to safeguard her family.

## I. Federal Referral of Medical Harm

27. In early 2023, Plaintiff suffered a significant medical crisis which she attributes in part to the extreme stress and harm caused by Defendants' actions. Plaintiff's serious health issues (including physical collapse and symptoms that were not properly treated) became intertwined with the harassment she faced. Plaintiff reported to federal authorities that she believed she had been the victim of medical malpractice or deliberate medical harm, possibly connected to the broader campaign against her. In response, the U.S. Department of Justice referred Plaintiff's medical harm allegations to the Department of Health and Human Services for investigation as potential federal crimes. While any medical malpractice or personal injury claims are not directly litigated in this action, the retaliation, false reporting, and harassment that Plaintiff experienced in the wake of her medical issues are central to this case. Defendants and their associates appeared to exploit Plaintiff's health troubles for example, by portraying her as mentally unstable (when she was in fact suffering from untreated medical conditions) in order to justify intervention by authorities. The federal referral of her medical harm claims underscores the seriousness of what Plaintiff endured. *(Exhibit ___ documents communications regarding the DOJ referral.)*

## J. Medical Retaliation and False CPS Report (May 23, 2023)

28. On May 23, 2023, approximately one week before the forcible removal of Plaintiff's son, Plaintiff was receiving nursing care as she recovered from the aforementioned trauma issues of the dropped human rights case. During a visit, Plaintiff asked her nurse (later identified as **Patricia Underwood**) for assistance in obtaining a faster referral to trauma counseling, explaining that she and her son were dealing with intense harassment and needed support. Plaintiff's 16-year-old son was present and forthrightly told the nurse that they were being harassed by CPS and others without cause. Instead of helping, the nurse responded in a manner that furthered the retaliatory campaign: Nurse Underwood contacted Child Protective Services and filed a **false report** suggesting that Plaintiff was "paranoid," "crazy," or otherwise mentally unwell and posing a risk to her child. This report was made despite Plaintiff's stable behavior during the visit and despite three independent mental health evaluations (including one emergency room psychiatric assessment) in the prior months that had all confirmed Plaintiff was **not** a danger to herself or others and did not suffer from any psychosis. *(See Exhibit ___ for affidavits or records of Plaintiff's mental health evaluations.)* The timing and content of Nurse Underwood's CPS report were not coincidental: Underwood repeated the same bizarre falsehood that Hines-Melcher had told Plaintiff earlier claiming that the water in Plaintiff's apartment was "poisoning" her and implying that Plaintiff was insane for believing otherwise. This suggests that Nurse Underwood and Defendant Hines-Melcher had coordinated a false medical narrative about Plaintiff. Indeed, it was later revealed that Nurse Underwood had been in communication with Defendant Hines-Melcher (or others associated with Defendants) prior to making the report. The false CPS report of May 23, 2023 was a crucial step in fabricating a pretext to remove Plaintiff's child during a medical crisis.

Amendment Continued from page 6

Page 7 of 22

## K. Targeting of Plaintiff's Son in Fall of 2022-Spring 2023

29. In the months leading up to May 31, 2023, Defendants and their agents engaged in actions clearly aimed at Plaintiff's teenage son, who was not only an innocent minor but also a critical witness to much of the harassment Plaintiff had suffered. Defendant Hines-Melcher, in particular, took a keen interest in Plaintiff's son's whereabouts and routine. On or about April 11, 2023, Hines-Melcher **unlawfully videotaped** the interior of Plaintiff's apartment under the guise of a "maintenance" or "inspection" visit at a time when Plaintiff's son was home without Plaintiff present. No consent or warrant was obtained for this recording. Hines-Melcher's actions violated Plaintiff's expectation of privacy in her home and caused great distress to her son, who realized they were being watched. Around the same time, Hines-Melcher was observed **following Plaintiff's son** in the building. On one occasion, as the boy hurried back into their apartment, Hines-Melcher placed a note under his sneaker (which he had momentarily left in the hallway) just before he shut the door. The content of the note is not fully known to Plaintiff, but its surreptitious placement was clearly intended to send a message and intimidate.

30. Defendants' focus on Plaintiff's son appeared calculated to remove him as a "problem" for them he was a material witness who could corroborate Plaintiff's accounts of harassment and misconduct. He was banned from the resident gym. The **Suffern Central School District was** complicit in this targeting. School officials, who were aligned with Defendants, had precise knowledge that Plaintiff's son would be home alone on certain days. In fact, on May 31, 2023, it was the first day of Plaintiff's son's Memorial Day break from school, a detail known to school authorities. Upon information and belief, a school district employee or associate informed Defendant Hines-Melcher (or the police) that the child would be alone at home that morning. With this knowledge, Defendants planned their intervention. They even prepared tools: on May 31, 2023, individuals acting at Defendants' direction used a **string-like device** to slip through and **defeat the deadbolt lock** on Plaintiff's apartment door. They timed this entry tactic to coincide with the boy wearing noise-cancelling gaming headphones, ensuring he would not hear any knocking or the sounds of intrusion. These deliberate steps demonstrate a premeditated effort to gain unauthorized access to Plaintiff's home specifically to seize her son when Plaintiff was absent. Prior to this staff Bekim helped Plaintiff break inside her apartment when accidentally locked out after he was emailed the YouTube video.

## L. Premeditated Parking Deprivation (Memorial Day Weekend 2023)

31. Over Memorial Day weekend in 2023 (just days before the incident), Defendant Hines-Melcher took action to ensure Plaintiff would be away from her apartment on May 31. Hines-Melcher **revoked Plaintiff's designated parking spot** in the building's garage just before the holiday weekend, knowing that this would force Plaintiff to park farther away in public parking. When Plaintiff attempted to obtain a replacement overnight parking permit from the Village Hall for the public lot, she discovered that the permit was inexplicably never processed or printed. As a result, on the morning of May 31, 2023, Plaintiff had to park off-site and was not immediately present at the building. Upon information and belief, this was a deliberate setup: Defendants created a situation that would give them and the police a window of opportunity to enter the apartment without Plaintiff on the scene. Hines-Melcher's calculated removal of

Amendment continued from page 7

page 8 of 22

Plaintiff's parking privilege particularly on a holiday weekend when administrative offices were closed evidences forethought and intent to isolate Plaintiff's son while he was alone.

## M. May 31, 2023 Warrantless Entry and Seizure of Plaintiff's Son

32. In the late morning of **May 31, 2023**, while Plaintiff was out of the apartment due to the parking situation, Defendant **Carla Hines-Melcher**, acting in concert with several officers of the Suffern Police Department and other officials, facilitated a **warrantless entry** into Plaintiff's home and the seizure of Plaintiff's 16-year-old son. Hines-Melcher used her property management key (or key card) to unlock Plaintiff's apartment door for the officers. The police officers present **did not have a court order or warrant** authorizing them to remove the child from his home. The only document on scene was, upon information and belief, a piece of paper purporting to allow a "welfare check" or entry, but it did **not**authorize taking the child into custody. Despite the lack of any lawful order (no emergency removal order, no exigent circumstances), Hines-Melcher and the officers entered the residence. Plaintiff's son was inside, having just finished a napping before work. The officers with Hines-Melcher literally and figuratively giving them the key **seized the child** against his will and refuse to let him go to work. This traumatic removal was captured in part on three police body-worn camera video. The footage (and the transcript thereof) shows that Hines-Melcher and the police discussed their plan and acted in coordination. At one critical moment, immediately before unlocking the door, an officer is heard quietly confirming with Hines-Melcher that they were proceeding without a proper order, and Hines-Melcher proceeded anyway. *(True and correct excerpts of the body-worn camera footage are attached as Exhibit A, with still-frame images at Exhibit B.)* Plaintiff's son was then taken from the building by the officers and transferred to the police station then into the custody of Rockland County Child Protective Services. He would spend the next **142 days** in foster care, separated from Plaintiff. Plaintiff had **no knowledge** that this raid was occurring until after her son had been taken. The warrantless entry into Plaintiff's home and the kidnapping-like seizure of her child were done under color of law but in patent violation of Plaintiff's and her son's rights.

33. In the aftermath of the May 31, 2023 incident, Plaintiff learned that one of the Suffern police officers intimately involved Officer "Adams" (the same officer who had handled the Greg Weiss matter) **deliberately turned off her body-worn camera** at multiple pivotal moments that day, particularly during private discussions with Hines-Melcher in the building lobby and hallway. These gaps in video coincide with periods when Hines-Melcher and the officers were deciding how to proceed without legal authority. The intentional deactivation of the camera strongly suggests a consciousness of wrongdoing and an attempt to prevent the creation of evidence. Notably, as soon as the officers had removed Plaintiff's son and brought him to the lobby,  officer can be seen on video walking into a doorway  and then the footage stops immediately before Hines-Melcher is observed whispering to that officer off the record. This collusion between Hines-Melcher and the police is a linchpin of Plaintiff's case: it demonstrates a **meeting of the minds** between a private actor (the property manager) and state actors (the police) to violate Plaintiff's constitutional rights. In the BWC video Carla starts whispering to Adams and the camera shuts off at 38:56. This happens three separate times as she has my minor son under

Amendment Continued from page 8

her custody. Her total time on her three BWC is 65:26. The other two officers have total time no shut offs of 1:39:04 and 1:17:23.

## N. Post-Removal Intimidation and Witness Tampering

34. After May 31, 2023, Defendants and their associates continued to intimidate Plaintiff in an apparent effort to discourage her from fighting back or exposing what had happened. One notable example occurred in the weeks immediately following the child's removal: a man who had previously been seen stalking or monitoring Plaintiff around the property (often dressed in plain clothes such as a tank tops) suddenly appeared wearing a cap emblazoned with the word "POLICE." This individual, who was never officially identified by name, made his presence obvious to Plaintiff. Plaintiff's son later reported that he saw the same man watching their apartment building on the day of the removal, and that after the police took him on May 31, the man in the "POLICE" hat got into a **white Mercedes-Benz** and drove away, never to be seen at the property again. Plaintiff believes this person was either an off-duty officer or an agent of Defendants, planted to surveil her family and signal that law enforcement was involved in every aspect of her life. Plaintiff documented the license plate of the white Mercedes and provided it to investigators as dfw2109. The message from these post-removal actions was clear: **do not challenge what was done, or you and your family will continue to be watched and threatened.** Such conduct amounts to witness intimidation, as Plaintiff and her son were key witnesses to Defendants' wrongdoing. This was a tactic to destabilize as Carla was aware Greg Weiss wore a tank top Christmas Day while harassing her at her door in subzero temperatures.

## O. FCRA Credit Reporting Dispute and $49,000 False Debt

35. In the Summer of 2024, Plaintiff discovered that a very large and derogatory item had appeared on her personal credit reports. A debt collector and/or furnisher of credit information (specifically, **Hunter Warfield, Inc.**, acting on behalf of Defendants or the property) reported that Plaintiff owed approximately **$49,000** in rental arrears or fees. Plaintiff promptly disputed the false credit information with the consumer reporting agencies (CRAs) as provided under the Fair Credit Reporting Act. In Fall 2024, after receiving no relief from direct disputes, Plaintiff escalated the matter by filing a complaint with the federal Consumer Financial Protection Bureau (**CFPB**) about the inaccurate credit reporting and Defendants harassment. In response, the CRA notified the furnisher (Defendants or their agent) of the dispute, triggering the furnisher's duty to investigate. This being on Plaintiff's credit file, causing her credit score to plummet and hindering her ability to secure new housing or credit. It was only after regulatory pressure and what the furnisher dubiously characterized as "harassment" by Plaintiff in insisting on her rights that the furnisher finally removed the tradeline immediately, in August 2025. By then, the damage to Plaintiff's credit was done. Defendants' malicious reporting is another facet of their retaliation, aiming to ruin Plaintiff's financial reputation as punishment for standing up to them. *(See Exhibit ___ for CFPB complaint records and credit bureau correspondence.)*

*P. Supplemental Harassment and CFPB Complaints (July 2024 – August 2025)*

Amendment continued from page 9

Page 10 of 22

36. Defendants' pattern of retaliation did not cease even after Plaintiff brought legal action. In mid-2025, while Plaintiff was actively pursuing her rights in court, Defendants and their associates engaged in new acts of intimidation clearly aimed at discouraging her litigation. For example, on **July 31, 2025**, Plaintiff received an unsolicited communication via social media from an account affiliated with **Hunter Warfield** (the same debt collector involved in the false credit report) attempting to "connect" with her. Shortly thereafter, on **August 6, 2025**, Plaintiff was directly contacted by **Debra Goldstein**, a person closely connected to the GoldOller/Lynmark ownership network. Goldstein's communication was threatening as witness intimidation just contact alone insinuated that Plaintiff would face further consequences if she continued to pursue her claims. Plaintiff perceived these outreach attempts as veiled threats a reminder that those who had harmed her were monitoring her online presence and could reach her even outside the courtroom. Such actions constitute **witness tampering and retaliation** under federal law (e.g., 18 U.S.C. § 1512 and § 1513), as they were intended to intimidate Plaintiff (a witness and litigant) from fully testifying and seeking justice. *(Screenshots of the social media contact attempts and communications are attached as Exhibit ___.)*

## Q. Newly Discovered Evidence – Reopened Homicide Investigation

37. In August 2025, Plaintiff learned of a startling development that casts a dark shadow on the events she has endured. With investigation Plaintiff learned that the death of her mother, **Anna**, which occurred in the late 1990s, is now considered pending to reopen as a staged suicide **homicide investigation**. For decades, Plaintiff's mother's death had been officially treated as accidental or of natural causes. However, new evidence has emerged as of August 21, 2025 suggesting that foul play was involved, and that the same general nexus of individuals who have retaliated against Plaintiff may have had a connection to her mother's demise. This revelation has deeply shaken Plaintiff. She believes that there may be a **longstanding pattern of intimidation and retaliation** targeting her family, potentially spanning back to four generations. The possibility that her mother was murdered, and that it could be linked (directly or indirectly) to the powerful individuals and entities now opposing Plaintiff, demonstrates the extreme lengths to which this racketeering enterprise will go. While the homicide investigation is ongoing and Plaintiff awaits further details from law enforcement, the very fact of its existence supports Plaintiff's allegation that the retaliation she faces is not isolated or coincidental it is part of a **continuing pattern of orchestrated harm** designed to silence and punish those who stand up to corruption. Plaintiff includes this newly discovered evidence to underscore the urgency and gravity of her request for relief: without Court intervention, Plaintiff fears that the retaliatory campaign against her could escalate to physical harm, as it tragically may have in the past. *(Plaintiff will seek leave to supplement this Complaint with additional details or evidence from the pending homicide investigation once they become available. Exhibit ___ is reserved for any investigative report or correspondence confirming the status of that investigation.)*

*R. Newly Discovered Evidence – Reopened Homicide Investigation*

Amendment Continued from page 10

Page 11
~~Page 10~~ of 22

36. In addition to the false credit reporting described above, Plaintiff experienced ongoing retaliation and harassment documented in multiple complaints filed with the Consumer Financial Protection Bureau ("CFPB") and the Federal Trade Commission ("FTC"). These events occurred after the filing of the original Complaint and demonstrate Defendants' continuing pattern of retaliation.

37. A summary of these events is as follows:

a. July 6, 2024 – CFPB Complaint No. 240706-15091929: Plaintiff reported repeated robocalls originating from multiple states, believed to be connected to Defendant Hines-Melcher.

b. October 8, 2024 – CFPB Complaint No. 241008-16401569: Plaintiff reported Hunter Warfield's unlawful collection attempts; company agreed to remove tradeline.

c. October 29, 2024 – CFPB Complaint No. 241029-16720021: Plaintiff reported harassing robocalls from Beacon, NY; CFPB referred to FTC.

d. June 9, 2025 – CFPB Complaint No. 250609-21417650 (FTC Report No. 188530405): Plaintiff reported spoofed calls by "Mike Stevenson" of "GFS LLC," who attempted to discover Plaintiff's confidential location despite ACP protection.

e. July 31, 2025 – CFPB Complaint No. 250801-22815464: Plaintiff received a suspicious Facebook "contact attempt" linked to Hunter Warfield hours after filing a Human Rights corruption report. CFPB confirmed non-monetary relief, tradeline deletion, and cease-communication status.

38. These incidents demonstrate ongoing retaliation in response to Plaintiff's protected legal activity and violate federal protections, including the Fair Debt Collection Practices Act and the Fair Housing Act's retaliation provisions.

**P. Ongoing Retaliation During Litigation (2025)**

Amendment continued from page 11

Page 12 of 22

41. On August 21, 2025, Plaintiff discovered that the death of her mother, which occurred 26 years ago, is now the subject of an open homicide investigation.

42. This newly discovered evidence suggests a potential serial pattern of suspicious deaths and misconduct, and provides context for the broader intimidation and retaliation Plaintiff and her family have endured.

43. Plaintiff could not have included this information in her prior complaints because it was not available until August 2025. Plaintiff preserves this evidence on the record and respectfully requests leave, if necessary, to supplement her claims with additional details as the investigation develops.

# V. CAUSES OF ACTION

### Count I – Violations of the Fair Credit Reporting Act (15 U.S.C. § 1681s-2(b))

38. Plaintiff repeats and re-alleges each and every preceding paragraph as though fully set forth herein.

39. Defendants (including their debt collection agents) acted as *furnishers of information* to consumer reporting agencies with respect to Plaintiff's credit information. In that capacity, Defendants furnished false and derogatory information about Plaintiff specifically, a claimed debt of approximately $49,000 purportedly owed by Plaintiff to one or more credit bureaus.

40. In 2024, after discovering the false tradeline on her credit reports, Plaintiff filed disputes with the credit reporting agencies and through the CFPB, which in turn notified Defendants (and/or their agent Hunter Warfield) of the dispute. Defendants were thus on notice that Plaintiff contested the accuracy of the information they had provided.

41. Defendants willfully and/or negligently failed to conduct a reasonable investigation of Plaintiff's disputes and failed to correct or delete the inaccurate information, in violation of 15 U.S.C. § 1681s-2(b). Despite being provided with specific details about the errors (including proof that Plaintiff did not owe the alleged debt), Defendants verified or allowed the false information to remain on Plaintiff's credit file for an extended period. Defendants took no timely action to modify, block, or remove the erroneous $49,000 entry.

42. Defendants' acts and omissions as described above constitute violations of the Fair Credit Reporting Act. Defendants breached their statutory duties to investigate disputed information

Amendment continued from page 12

page 13 of 22

and to report results to the consumer reporting agencies, and they failed to correct information they knew (or had reasonable cause to believe) was inaccurate.

43. As a direct and proximate result of Defendants' FCRA violations, Plaintiff suffered damages, including a drastically lowered credit score, denial of housing and credit opportunities, increased costs of credit, and emotional distress (such as humiliation, anxiety, and loss of reputation). Plaintiff's ability to secure new housing after her eviction was impaired by Defendants' false credit report. Plaintiff also expended time and resources attempting to resolve the inaccuracies. Pursuant to 15 U.S.C. § 1681n and § 1681o, Defendants are liable to Plaintiff for her actual damages, statutory and punitive damages (for willful non-compliance), and for the attorneys' fees and costs of this action.

**Count II – Civil Rights Violations (42 U.S.C. § 1983 – Fourth and Fourteenth Amendments; Joint Action with State Actors)**

44. Plaintiff repeats and re-alleges each and every preceding paragraph as though fully set forth herein.

45. Defendants GoldOller, Lynmark, and Carla Hines-Melcher, acting in concert and under color of state law, deprived Plaintiff of rights, privileges, and immunities secured by the Constitution of the United States specifically, her right under the **Fourth Amendment** to be free from unreasonable searches and seizures in her home, and her **Fourteenth Amendment** right to due process of law and to the care, custody, and management of her child (familial integrity). Although Defendants are private entities/individuals, they engaged in *joint action* and conspired with state actors (including officers of the Suffern Police Department and other government agents) to accomplish the unlawful entry into Plaintiff's home and seizure of her child.

46. In furtherance of this conspiracy and joint action, Defendant **Carla Hines-Melcher** willfully participated in the May 31, 2023 raid by unlocking Plaintiff's apartment door for police officers, despite knowing that the officers did not possess a valid warrant or court order. Prior to this she protected resident Harold Atrip and would not cooperate with the Ramapo PD when they had a real arrest warrants he was using my apartment number to hide. Hines-Melcher acted *under color of law* by virtue of this collaboration, effectively stepping into the role of a state actor. She and the officers shared a mutual understanding and meeting of the minds: to remove Plaintiff's son regardless of legal authorization. The coordination between Hines-Melcher and the officers is evidenced by, inter alia, their recorded conversations and the officers' deliberate deactivation of body cameras while conferring with Hines-Melcher.

47. Defendants **GoldOller Real Estate Investments** and **Lynmark Group–Orange Avenue Apartments, LLC** are responsible for the actions of their agent, Hines-Melcher, and were knowing participants in (or later ratified) the joint unlawful conduct. These corporate Defendants, through their managers and employees, allowed and encouraged Hines-Melcher's cooperation with law enforcement to carry out an unlawful objective. The removal of Plaintiff's son served Defendants' interests by silencing a witness and retaliating against Plaintiff, and it was undertaken as a de facto policy or practice of retaliatory collaboration with authorities.

Amendment Continued from page 13

page 14 of 22

48. By engaging in the acts described, all Defendants acted *under color of state law* within the meaning of 42 U.S.C. § 1983. Defendants conspired with and willingly assisted state officials in depriving Plaintiff of her constitutional rights. The conduct was taken without any lawful justification: no emergency was present, no court order existed of legal removal, and Defendants knew or should have known that removing the child violated clearly established rights. The joint engagement of the private and state actors was so entwined that Defendants are answerable as state actors themselves.

49. As a direct and proximate result of Defendants' actions in violation of § 1983, Plaintiff suffered damages including the unlawful loss of custody of her son for 142 days, severe emotional distress, trauma, reputational harm, and loss of her sense of security in her home. Plaintiff's son likewise suffered emotional and psychological harm due to the sudden separation (though he is not a plaintiff in this action). Plaintiff was forced to incur malicious prosecution and expend enormous effort to secure her son's return. She also suffered physical stress-related ailments as a result of the shock and grief. Plaintiff seeks compensatory damages for these injuries. In addition, Defendants' conduct was motivated by evil intent and a callous disregard of Plaintiff's rights, justifying an award of punitive damages under § 1983 to punish and deter such unlawful collusion between private landlords and police.

## Count III – Violations of the Fair Housing Act (42 U.S.C. § 3601 *et seq.* – Discrimination and Retaliation)

50. Plaintiff repeats and re-alleges each and every preceding paragraph as though fully set forth herein.

51. Plaintiff is a member of classes protected under the federal Fair Housing Act ("FHA"). In particular, Plaintiff is a **survivor of domestic violence** a status closely associated with sex-based discrimination, as the vast majority of domestic violence victims are women and Plaintiff is also a person with **"familial status"** as defined by 42 U.S.C. § 3602(k) (she is the parent of minor children). Defendants were aware of Plaintiff's protected status: they knew Plaintiff had a teenage son living with her, and they knew from Plaintiff's disclosures and the Address Confidentiality Program granted after these crimes by them that she was a prior victim of domestic abuse. Additionally, Plaintiff engaged in activities protected under fair housing law, including requesting reasonable security measures, applying for rental assistance, and filing civil rights complaints about Defendants' conduct.

52. Defendants GoldOller, Lynmark, and Carla Hines-Melcher violated the Fair Housing Act by subjecting Plaintiff to discriminatory terms and conditions of rental, and by retaliating against her for exercising her fair housing rights. Defendants' discriminatory and harassing actions included, but were not limited to: **refusing to renew Plaintiff's lease and aggressively pursuing her eviction** despite her ERAP protection (thereby removing a domestic violence survivor and her child from housing); **harassing and intimidating Plaintiff on the basis of her gender and familial status** (for example, Hines-Melcher targeting Plaintiff with surveillance and baseless accusations that she was "insane" or a bad mother, stereotypes often used against women survivors); **interfering with Plaintiff's use of housing services** (such as removing her parking

Amendment continued from page 14

page 15 of 22

privileges and threatening to tow her vehicle, which disproportionately burdened Plaintiff as a single mother and abuse survivor with limited mobility); and **facilitating a hostile housing environment** by allowing third parties (like Greg Weiss and others) to menace Plaintiff without proper intervention.

53. Defendants further **retaliated** against Plaintiff for her attempts to secure her rights. After Plaintiff filed complaints with the Division of Human Rights and voiced objections to how she was treated, Defendants escalated their adverse actions. They initiated eviction proceedings immediately after Plaintiff sought assistance (e.g., reaching out to GoldOller's principal, filing complaints) and they colluded with local authorities to "punish" Plaintiff for not remaining silent. The timing of Defendants' actions  such as serving Plaintiff with notices or revoking amenities right after learning of her legal activities evidences a retaliatory motive. Defendant Hines-Melcher's statements and conduct also betray unlawful animus: she referred to Plaintiff in dismissive and derogatory terms (calling her a *troublemaker* and implying that her issues were self-inflicted because she was "overdramatic," which are thinly veiled references to Plaintiff's status as an abuse survivor). Such comments and actions indicate that Defendants wanted to be rid of Plaintiff because of **who she was (a survivor and single mother)** and because she **stood up for her rights**.

54. Defendants' conduct violated multiple provisions of the Fair Housing Act, including 42 U.S.C. § 3604(b), which makes it unlawful to discriminate against any person in the terms, conditions, or privileges of rental of a dwelling because of sex or familial status (among other protected traits). Treating a domestic violence victim as a "problem tenant" due to the abuse against her, and targeting a tenant because she has children, are forms of sex and familial status discrimination prohibited by § 3604. In addition, Defendants violated 42 U.S.C. § 3617, which prohibits coercion, intimidation, threats, or interference with any person's exercise or enjoyment of rights granted or protected by the FHA. Defendants interfered with Plaintiff's fair housing rights by evicting her for seeking federally-funded assistance (ERAP) and for complaining about discrimination, and by orchestrating a campaign of intimidation reversed engineered crime (including the ultimate interference forcing her and her child out of their home).

55. As a direct and proximate result of Defendants' discriminatory and retaliatory housing practices, Plaintiff suffered injuries and losses. She lost her home and the stability it provided, had to relocate under duress, and was effectively blacklisted from obtaining equivalent housing (especially given the damage to her rental history and credit). Plaintiff experienced significant emotional distress, including anxiety, fear for her and her son's safety, humiliation, and a sense of degradation from being treated as unworthy of fair housing. Plaintiff's minor son also endured trauma, having been uprooted from his home and community. Plaintiff accordingly seeks all relief available under the Fair Housing Act, including compensatory damages for economic losses (such as relocation costs and higher housing expenses) and for emotional harm, as well as punitive damages against Defendants for their willful, wanton, and malicious violation of her civil rights. Plaintiff also seeks appropriate injunctive and equitable relief to prevent Defendants from engaging in such unlawful housing practices against other tenants.

Amendment continued from page 15

page 15 from 22

**Count IV – Civil RICO (18 U.S.C. § 1962(c) & (d) – Pattern of Racketeering Activity)**

56. Plaintiff repeats and re-alleges each and every preceding paragraph as though fully set forth herein.

57. At all relevant times, the Defendants and their associates constituted an **"enterprise"** within the meaning of 18 U.S.C. § 1961(4). This enterprise is an ongoing organization, formal or informal, of individuals and entities associated for the common purpose of engaging in a pattern of retaliatory, fraudulent, and illegal acts against Plaintiff (and others), in order to preserve Defendants' financial interests, silence complaints, and avoid accountability. The enterprise described includes Defendants **GoldOller Real Estate Investments** and **Lynmark Group–Orange Avenue Apartments, LLC**, their management and employees (such as Defendant Hines-Melcher and other staff like "Bekim L." mentioned in Plaintiff's prior pleadings), and other collusive actors in the community (including but not limited to certain local officials, a private security company, and individuals like Joshua T. Goldstein, Jacqueline Goldman, Michael Klein, and Debra Goldstein who have been identified as part of Defendants' network). The enterprise engages in and its activities affect interstate commerce, as it involves multi-state real estate business, the use of interstate mail and wires, and the interference with federally funded programs (ERAP) and investigations.

58. Defendants, through the above-described enterprise, **conducted and participated in the conduct of the enterprise's affairs** through a **pattern of racketeering activity** in violation of 18 U.S.C. § 1962(c). From at least 2019 through 2025, Defendants committed multiple racketeering acts, as defined in 18 U.S.C. § 1961(1), that were related to each other and amount to or pose a threat of continued criminal activity. These acts included but are not limited to:

- **Obstruction of Justice and Witness Tampering:** Defendants, and persons acting on their behalf, engaged in multiple acts indictable under 18 U.S.C. §§ 1503 and 1512. They interfered with the due administration of justice by causing evidence (such as the Weiss arrest record and other complaints) to be sealed or suppressed, and by tampering with witnesses. For example, Defendants orchestrated the removal of Plaintiff's son a material witness thereby preventing him from testifying on Plaintiff's behalf. They also intimidated Plaintiff through surveillance (e.g., illegal video recordings and the presence of the "POLICE" hat individual) and through direct threats (e.g., Debra Goldstein's August 2025 contact) to deter her from pursuing legal remedies. Each such act (intimidating a witness, interfering with evidence) constitutes racketeering activity.
- **Retaliation Against a Witness/Victim:** Defendants committed acts indictable under 18 U.S.C. § 1513 by retaliating against Plaintiff for providing information to law enforcement and regulatory authorities and for participating in official proceedings (such as her Human Rights complaints and reports to federal agencies). After learning of Plaintiff's cooperation with authorities, Defendants evicted her, damaged her credit, and threatened her, all in retaliation for her lawful efforts to report crimes and assert her rights. These retaliatory acts were intended to punish Plaintiff and dissuade her from further cooperation, and are part of the racketeering pattern.

Amendment Continued from Page 15

Page 16 of 22

- **Mail Fraud and Wire Fraud:** Defendants engaged in multiple acts of fraud using the U.S. mails and interstate wires, indictable under 18 U.S.C. §§ 1341 and 1343. For instance, in furtherance of their scheme to defraud Plaintiff of her property and rights, Defendants (or their associates) mailed false documents and made misrepresentations: (i) they transmitted false information to credit reporting agencies (via mail or electronic communication) to claim a fake debt, thus attempting to defraud Plaintiff of money or property (credit expectancy) by means of false pretenses; (ii) they intercepted or diverted Plaintiff's mail (such as not delivering her Village Hall parking permit, and possibly withholding court or agency notices), thereby preventing her from receiving critical information an act which also constitutes mail obstruction under 18 U.S.C. § 1702. Additionally, communications between Defendants and corrupt officials (such as emails or phone calls coordinating the Human Rights complaint shutdown and the police raid) were transmitted via interstate channels and furthered the fraudulent and illegal scheme. Each mailing or wiring that contained false statements (for example, the notice to credit bureaus about a $49,000 debt, or electronic communications spreading the "Mrs. Davis" misinformation to state agencies) constitutes a predicate act of mail or wire fraud.

- **Kidnapping and Abduction:** The unlawful **seizure of Plaintiff's son** on May 31, 2023 was tantamount to **kidnapping**, a predicate act under RICO (see 18 U.S.C. § 1961(1)(A), incorporating state crimes such as kidnapping that are punishable by more than one year). Under New York law, it is a serious felony to take or entice a child without legal authority. Defendants, in complicity with certain officials, effected the abduction of the child from his home without consent or court order. This act was part of the scheme to retaliate against Plaintiff and to obstruct justice (by removing a witness), and it constitutes a predicate racketeering act. Additionally, Plaintiff was effectively **extorted** of her custodial rights Defendants used the threat of continued separation from her child to try to force Plaintiff into silence, which is akin to extortion (obtaining something of value, in this case Plaintiff's forbearance from legal action, through coercion).

- **Extortion and Financial Coercion:** Defendants and their confederates committed acts indictable under, inter alia, 18 U.S.C. § 1951 (Hobbs Act extortion) by using fear and economic pressure to compel Plaintiff to abandon her rights. The false credit reporting and the aggressive eviction despite ERAP protections were methods of extortion: Defendants signaled that unless Plaintiff dropped her complaints, they would ruin her financially and take away her home and child. Further, the initial fraud that deprived Plaintiff of her co-op apartment involved extortive and fraudulent acts by individuals connected to Defendants (Michael Klein and others), all designed to steal Plaintiff's property. Those acts are part of the pattern, showing a repeated willingness to use fraud and coercion to achieve Defendants' aims.

59. The racketeering acts outlined above had the same or similar purposes, results, participants, and methods of commission, and were otherwise interrelated by distinguishing characteristics. In particular, each act was carried out with the purpose of silencing Plaintiff, punishing her for asserting her rights, and protecting the enterprise's members from legal jeopardy or financial loss. The acts had similar results and participants: often involving Hines-Melcher, certain local officials, and other co-conspirators, and resulting in harm to Plaintiff

*Amendment continued from page 16*

*page 17 of 22*

(loss of home, loss of child, damage to credit, intimidation). The methods false reports, misuse of government processes, intimidation via mail/communications repeat across incidents. Defendants' racketeering acts amount to a **continuous pattern**: they began as early as 2019 (with harassment and interference in legal processes) and continued through 2025 (with ongoing intimidation), demonstrating continuity over many years. Furthermore, there is a threat of continued criminal activity because Defendants have not hesitated to use these tactics against Plaintiff and could use them against others who oppose them. The enterprise's conduct is open-ended, given that Defendants remain in positions of power and could recidivate.

60. Each Defendant named herein **conducted or participated, directly or indirectly, in the conduct of the enterprise's affairs** through the pattern of racketeering described, in violation of 18 U.S.C. § 1962(c). Hines-Melcher personally executed many of the predicate acts (unlocking the door, harassing communications, mail interference, etc.). GoldOller and Lynmark, through their principals and agents, orchestrated and benefitted from the racketeering activity (e.g., GoldOller's officers coordinated with local officials to quash investigations and initiate bogus eviction/credit actions; Lynmark's operations staff aided surveillance and entry). All Defendants knew about and agreed to the commission of multiple racketeering acts as part of a scheme to injure Plaintiff.

61. In addition, Defendants conspired with each other and with other members of the enterprise to violate RICO, in violation of 18 U.S.C. § 1962(d). There was an agreement among Defendants and their associates to engage in the pattern of racketeering activity outlined above. Various meetings and communications took place (some in person at the property, some via phone/email) wherein the conspirators planned how to "handle" Plaintiff ranging from the decision to evict her after she met with GoldOller's representative, to the plan on May 31, 2023 to take her child, to the coordinated false narratives given to CPS and other agencies. Each Defendant was a knowing and willing participant in the conspiracy, as evidenced by their overt acts: for example, Hines-Melcher's overt acts have been detailed; GoldOller's executives (such as Joshua T. Goldstein) took overt acts by directing eviction filings the day after Plaintiff reached out for help; Lynmark's management took overt acts by providing the resources and approval for Hines-Melcher's actions. The conspirators further include individuals who are not formal defendants here (such as the District Attorney Walsh, who directed the DHR case dropped, or any law enforcement officers who collaborated illicitly), and these persons acted in furtherance of the same unlawful objective. Defendants are liable for all acts of racketeering done by co-conspirators in furtherance of the conspiracy, even if not personally performed by a particular Defendant.

62. As a direct and proximate result of Defendants' racketeering conduct and conspiracy, Plaintiff has been **injured in her business or property**, within the meaning of 18 U.S.C. § 1964(c). Plaintiff's injuries include, but are not limited to: the loss of her leasehold interest and home (a property interest) through fraudulent and retaliatory eviction; the loss of her personal property that was left behind or rendered unusable due to the circumstances of her eviction (and costs of storage/moving); the damage to her credit and reputation, which is an injury to her financial property interests and ability to obtain housing or employment; and significant out-of-pocket expenses such as legal fees, travel costs, and other expenditures to address or

Amendment Continued from page 17

Page 18 of 22

mitigate Defendants' acts (including costs to regain custody of her son and to secure new housing and medical care). These injuries are concrete financial harms. Plaintiff also suffered substantial emotional injuries, though RICO primarily recognizes injury to business or property the emotional distress underscores the reprehensible nature of Defendants' conduct, but the Court may also consider that Defendants' actions effectively hampered Plaintiff's ability to work or conduct business due to the distress and distraction of combating the enterprise's attacks.

63. Pursuant to 18 U.S.C. § 1964(c), Plaintiff is entitled to recover **threefold (treble) the damages** she has sustained, plus the costs of this suit and reasonable attorneys' fees. Plaintiff also seeks appropriate equitable relief under RICO, including an injunction to prevent Defendants from continuing their pattern of racketeering activity and to dissolve or reorganize the enterprise as necessary to protect the public.

# VI. PRAYER FOR RELIEF

WHEREFORE, Plaintiff **Wendy Marie Drews** respectfully requests that this Court enter Judgment in her favor and against Defendants, and grant the following relief:

**A. Compensatory Damages:** An award of compensatory damages in an amount to be determined at trial, to compensate Plaintiff for the losses she has suffered, including but not limited to: damage to her property and property interests (loss of her home and personal property), damage to her credit and financial standing, expenses incurred due to Defendants' conduct (such as relocation costs, legal fees, and medical expenses), and emotional pain and suffering, mental anguish, and loss of enjoyment of life.

**B. Statutory and Treble Damages:** An award of any applicable statutory damages, including treble damages under the RICO Act (18 U.S.C. § 1964(c)) for the racketeering injuries to Plaintiff's business and property, and statutory/punitive damages under the Fair Credit Reporting Act for Defendants' willful failure to comply with FCRA requirements.

**C. Punitive Damages:** An award of punitive or exemplary damages to punish Defendants for their willful, malicious, and egregious conduct and to deter such conduct in the future, particularly with respect to the § 1983 civil rights violations and the Fair Housing Act violations.

**D. Declaratory Relief:** A declaratory judgment pursuant to 28 U.S.C. §§ 2201–2202 declaring that Defendants' actions, as set forth herein, violated Plaintiff's rights under federal law – including declarations that Defendants' conduct violated Plaintiff's Fourth and Fourteenth Amendment rights, the Fair Credit Reporting Act, the Fair Housing Act's provisions on discrimination and retaliation, and the civil racketeering statutes.

**E. Injunctive Relief:** A permanent injunction prohibiting Defendants (and their officers, agents, employees, and all persons in active concert or participation with them) from engaging in further unlawful conduct against Plaintiff. Such injunctive relief should include, but not be limited to: (i) prohibiting Defendants from directly or indirectly harassing, contacting, or surveilling Plaintiff or her family; (ii) prohibiting Defendants from retaliating against Plaintiff for pursuing this action or

Amendment Continued from page 18                    page 19 of 22

any other lawful activity; (iii) requiring Defendants to remove any remaining derogatory credit reports or other public records caused by their actions (e.g., ensuring the false $49,000 debt is not reported and that any eviction records improperly caused by Defendants are sealed or expunged); (iv) enjoining Defendants from colluding with law enforcement or other government officials to interfere with Plaintiff's rights or retaliate against her (for example, an order barring Defendants from initiating baseless proceedings or "wellness checks" regarding Plaintiff); and (v) requiring Defendants to implement policies or training to prevent in the future the type of unlawful conduct described herein (such as requiring GoldOller/Lynmark personnel to respect tenant rights, refrain from discrimination, and not grant police access absent proper legal process).

**F. Attorneys' Fees and Costs:** An award of Plaintiff's reasonable attorneys' fees and costs of this action, to the extent permitted by law. (Although Plaintiff is self-represented *pro se* at this time, to the extent she later retains counsel or is entitled to costs, this request is made. Attorneys' fees are expressly available under statutes such as 42 U.S.C. § 1988 for the § 1983 claim, 42 U.S.C. § 3613(c)(2) for the FHA claim, 15 U.S.C. § 1681n(a)(3) for FCRA, and 18 U.S.C. § 1964(c) for RICO.)

**G. Such Other and Further Relief:** Granting such other and further relief as the Court deems just, equitable, and proper, including (if appropriate) referring this matter to law enforcement for investigation of potential criminal violations that have emerged from the facts (such as 18 U.S.C. §§ 241, 242 for civil rights conspiracies, or other federal and state crimes). Plaintiff also seeks any necessary orders to protect her and her family from any ongoing danger (for example, allowing expedited enforcement of the injunction, or any relief in aid of state proceedings to restore custody or address the reopened homicide investigation if relevant to this case).

# VII. JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues so triable.

Respectfully submitted this 27 day of August, 2025.

**Wendy Marie Drews**
Plaintiff, Pro Se
ACP 7037, P.O. Box 1110
Albany, NY 12201-1110
(Residential Address Protected by ACP)

# VIII. EXHIBIT LIST *(Plaintiff will file or attach the following exhibits to this Complaint)*

Amendment Continued from page 19

page 20 of 22

- **Exhibit A:** Transcript Excerpts of Suffern Police Department Body-Worn Camera Footage from May 31, 2023 (showing interactions between Defendant Hines-Melcher and officers, and the moment of entry into Plaintiff's apartment).
- **Exhibit B:** Still Frame Photographs from Body-Worn Camera Video (key moments, including officers and Hines-Melcher outside Plaintiff's door, and timestamps where the camera was deactivated).
- **Exhibit C:** Correspondence and Records of Credit Dispute (Plaintiff's letters to credit bureaus and CFPB Complaint No. [####], and the responses from the furnisher removing the false $49,000 tradeline).
- **Exhibit D:** New York State Division of Human Rights Complaints and Closure Letters (including Case No. 10233271 involving Greg Weiss, and the 2023 housing discrimination complaint against Defendants, with any related email from DHR citing the directive to drop the case).
- **Exhibit E:** ERAP Approval Notice and Related Court Filings (proof of Plaintiff's ERAP assistance covering late 2022–early 2023, and any eviction petition or stipulation showing the timing of Defendants' eviction action).
- **Exhibit F:** Affidavits/Letters regarding Plaintiff's Mental Health Evaluations (declarations from medical professionals in 2022–2023 confirming Plaintiff had no psychiatric illness, countering Defendants' false narrative).
- **Exhibit G:** Photographs and Video Stills of Surveillance and Intimidation Incidents (including the individual wearing a "POLICE" hat and the white Mercedes-Benz license plate referenced in the Complaint).
- **Exhibit H:** Any Law Enforcement Confirmation of Homicide Investigation (e.g., a letter or email from [Police Department] dated on or about August 21, 2025, stating that [Plaintiff's Mother]'s death is under active investigation as a homicide).Exhibit I: CFPB Complaint Nos. 240706-15091929, 241008-16401569, 241029-16720021, 250609-21417650, and 250801-22815464 (with CFPB/FTC responses).
- Exhibit J: Notice of pending reopening Homicide Investigation regarding Plaintiff's mother (August 21, 2025).

*(Plaintiff reserves the right to supplement or amend this exhibit list as additional evidence is obtained.)*

Included are USDC Certificate September 2024    Total of 59 pages
Complaint 4 pages plus 1 pro Se Consent    with Certificate
Additional 28 pages with 22 page Amendment complaint

Revised I just counted 22 pages and pages 14-15 were is
the Confusion mix up. I apoligize. Sorry about that.

Sorry I think it printed as 21 pages here not 22 Sorry about
the Confusion

Amendment from Page 20                          Page 21 of 22



Exhibit G  Man resident with "Police" hat/ intimidation
after May 31, 2023
Photographs and video stills of surveillance and
Intimidation Incidents



Stakeholder ~~Conflicts~~ conflicts |political ties Exhibit K

Subject: Request to Transfer Case to Federal HUD and Issue Notice of Right to Sue – Case No. 10233271 (Drews v. GoldOller et al) problem

**Sharima Khairullah** *(she/her/hers)*
*Human Rights Specialist 1*
Fair Housing Investigations, Housing Investigations Unit
**New York State Division of Human Rights**
One Fordham Plaza, Fourth Floor, Bronx, NY 10458
W: (718) 741-8421 | C: (929)-627-5540 | Sharima.Khairullah@dhr.ny.gov
dhr.ny.gov

Dear Sharima Khairullah (DHR),

I am writing in reference to my pending case before the Division of Human Rights:

Wendy Drews v. The Lynmark Group under Orange Avenue Apartments, LLC; Joshua T. Goldstein; The Sheldon at Suffern Station Apartments; Carla Hines-Melcher; GoldOller Real Estate Investments (Case No. 10233271)

This case involves serious allegations of retaliation, discrimination, illegal harassment, due process violations, fabricated credit fraud, and the unlawful removal of my minor child. Human Rights violations all in connection with housing and government abuse of power.

I have also filed this matter in federal court:

Drews et al v. GoldOller Real Estate Investments et al,
Case No. 1:24-cv-06697-LTS,
U.S. District Court, Southern District of New York.

Given that I am actively pursuing relief through the federal courts and no resolution has been reached through NYS DHR, I am formally requesting the following:

1. That the Division terminate its investigation and transfer jurisdiction to the U.S. Department of Housing and Urban Development (HUD) so the case may go ahead federally. Unless they agree on Settlement Proposal.

2. That the Division issue a Notice of Right to Sue under the New York State Human Rights Law, enabling me to pursue claims through civil litigation.

I reserve all rights to continue my action under federal civil rights statutes, the Fair Housing Act, and 42 U.S.C. § 1983. Please confirm in writing that these requests are being processed by you as investigator and provide the necessary written documentation.

Furthermore, I respectfully ask that all case file documents, including the relevant body-worn camera (BWC) footage, be transmitted directly to the presiding judge Laura Taylor Swain and proper federal authorities overseeing this matter.

Thank you for your time and attention. I am available by email for further follow-up.


Sincerely,
Wendy Drews
ACP-protected address

# Case Summary Conciliation – Wendy Drews

## July 7, 2025

Case Summary Conciliation - Wendy Drews v Lynmark Group under Orange Avenue Apartments, LLC; Joshua T. Goldstein; The Sheldon At Suffern Station Apartments; Carla Hines-Melcher; Gold Oller Real Estate Investments (Case#10233271) with investigator Khairullah, Sharima (DHR)

## Summary

Ms. Drews reports enduring sustained psychological and emotional harm following harassment by a property manager after enduring harassment where an order of protection was the only remedy against a male perpetrator. This was after escaping an abusive marriage and prolonged ten year divorce. The situation deteriorated when her child was allegedly abducted during an illegal eviction, despite protections afforded under New York State's Emergency Rental Assistance Program (ERAP). Her son was witness to illegal videotaping of apartment on April 11, 2023.

## Legal Claims and Violations

The complainant identifies several statutory and constitutional violations, including:

- - Retaliation for ERAP Participation
- - Illegal Eviction Without Court Order
- - Source of Income Discrimination
- - Harassment and Hostile Housing Environment
- - Child Neglect and Abuse
- - Fair Housing Act and Civil Rights Violations

## Impact on Family

As the first residents of the building, the complainant found the persistent harassment and toxic behavior inexplicable. During an event, the complainant informed Carla that she had signed a legal retainer on June 1, 2022, to pursue action against a predatory individual. This disclosure reportedly resulted in a

noticeable change in Carla's behavior. The complainant also confided in Charlene Santelli, a school social worker, regarding this matter. Subsequently, when the complainant applied for Emergency Rental Assistance Program (ERAP) benefits, Charlene allegedly printed out an email that, through associated email addresses, established a connection between the involved parties.

The wrongful eviction tries during covered and protection period and other alleged misconduct significantly disrupted her son's education and aspirations, including his participation in a culinary program and his intended law enforcement career path. Emotional and psychological harm resulting from these actions is cited as a basis for further damages.

## Discriminatory and Retaliatory Acts

Ms. Drews outlines instances of discrimination, including unlawful rent increases, failure to enforce orders of protection, and retaliatory eviction efforts. She also describes interference by law enforcement tied to misuse of her apartment number to locate Harold Atrip by warrant. Carla wouldn't give the police his location citing privacy right violations where strict in NYS.

## Damages Sought

The complainant seeks compensation for financial losses (including property damage, annuity disruptions, and legal costs), emotional distress, educational and career interruption, and human rights violations. She emphasizes that the proposed settlement offers of $7,000–$10,000 is inadequate given the extent of the harm.

Additional documentation was omitted in accordance with the directive of the newly assigned investigator from the Division of Human Rights (DHR), who requested that no written narrative be included. However, as a survivor of medical malpractice, the complainant found it untenable to fully internalize the events without providing at least a brief written summary to accompany the transfer request and proposed settlement offer. The investigator clarified that this limitation was imposed under DHR policy, not at the complainant's discretion. The complainant asserts that her tenant rights were comprehensively violated and that she was subjected to unlawful actions by multiple stakeholders. Should a full report be formally requested, she is prepared to provide it; however, due to its extensive length, it has not been included here.

Respectfully Done,

Wendy Drews
ACP 7037
P.O. Box 1110
Albany, N.Y. 12201-1110

## Case Summary Conciliation - Wendy Drews
July 7, 2025

Case Summary Conciliation - Wendy Drews v Lynmark Group under Orange Avenue Apartments, LLC; Joshua T. Goldstein; The Sheldon At Suffern Station Apartments; Carla Hines-Melcher; Gold Oller Real Estate Investments (Case#10233271) with investigator Khairullah, Sharima (DHR)

### Summary

Ms. Drews reports enduring sustained psychological and emotional harm following harassment by a property manager after enduring harassment where an order of protection was the only remedy against a resident male perpetrator. This was after escaping an abusive marriage and prolonged ten-year divorce. The situation deteriorated when her child was allegedly abducted during an illegal eviction, despite protections afforded under New York State's Emergency Rental Assistance Program (ERAP). Her son was witness to illegal videotaping of apartment on April 11, 2023. He was removed as a tenant unlawfully.

### Legal Claims and Violations

- - Retaliation for ERAP Participation
- - Illegal Eviction Without Court Order
- - Eviction attempts during ERAP   protected periods Nov. 5, 2022-March 7, 2023.
- - Source of Income Discrimination
- - Harassment and Hostile Housing Environment
- - Child Abduction and Abuse
- - Fair Housing Act and Civil Rights Violations

### Impact on Family

As the first residents of the building, the complainant found the persistent harassment and toxic behavior inexplicable. During an event, the complainant informed Carla that she had signed a legal retainer on June 1, 2022, to pursue action against a predatory individual. This disclosure reportedly resulted in a noticeable change in Carla's behavior. The complainant also confided in Charlene Santelli, a school social worker, regarding this matter. Subsequently, when the complainant applied for Emergency Rental Assistance Program (ERAP) benefits, Charlene allegedly printed out an email that, through associated email addresses, established a connection between the involved parties.

The wrongful eviction tries during covered and protection period and other alleged misconduct significantly disrupted her son's education and aspirations, including his

participation in a culinary program and his intended law enforcement career path. Emotional and psychological harm resulting from these actions is cited as a basis for further damages.

## Discriminatory and Retaliatory Acts

Ms. Drews outlines instances of discrimination, including unlawful rent increases, failure to enforce orders of protection, and retaliatory eviction efforts. She also describes interference by law enforcement tied to misuse of her apartment number to locate Harold Atrip by warrant. Carla wouldn't give the police his location citing privacy right violations where strict in NYS.

## Damages Sought

The complainant seeks compensation for financial losses (including property damage, annuity disruptions, and legal costs), emotional distress, educational and career interruption, and human rights violations. She emphasizes that the proposed settlement offers of $7,000–$10,000 is inadequate given the extent of the harm.

Additional documentation was omitted in accordance with the directive of the newly assigned investigator from the Division of Human Rights (DHR), who requested that no written narrative be included. However, as a survivor of medical malpractice, the complainant found it untenable to fully internalize the events without providing at least a brief written summary to accompany the transfer request and proposed settlement offer. The investigator clarified that this limitation was imposed under DHR policy, not at the complainant's discretion. The complainant asserts that her tenant rights were comprehensively violated and that she was subjected to unlawful actions by multiple stakeholders. Should a full report be formally requested, she is prepared to provide it; however, due to its extensive length, it has not been included here.

Respectfully Done,
Wendy Drews
ACP 7037
P.O. Box 1110
Albany, N.Y. 12201-1110

## Second Settlement Proposal

Conciliation - Wendy Drews v Lynmark Group under Orange Avenue Apartments, LLC; Joshua T. Goldstein; The Sheldon At Suffern Station Apartments; Carla Hines-Melcher; Gold Oller Real Estate Investments (Case#10233271) with investigator Khairullah, Sharima (DHR)

July 7, 2025

### Notice of Intention to Sue:

The initial notice of intention to sue on or around December 13, 2023 was filed based on ongoing harassment, false accusations, and the unrelenting legal battles with the Town of Ramapo, Rockland County Family Court, and the Appellate Second Division. Due to the threats to my family's safety and well-being, I had been forced to pursue legal action and demand $100,000,000 in compensation for the emotional distress, financial losses, and abuse we endured. The constant fear for our lives due to this ongoing harassment has taken a severe toll on my family. I put the high amount out of **severe distress** and fear for my sons' and my life. They would not stop.

### 1. Emotional Distress:

For You (Primary Victim): $500,000
For Your Son: $400,000
For Other Family Members: $200,000
Subtotal for Emotional Distress: $1,100,000

The trauma I endured as a resident at The Sheldons, including being subjected to crimes and harassment, led to significant emotional distress. In addition to these personal hardships, I was placed under the Address Confidential Program (ACP) for 4 years due to the psychological impact of these events. The prolonged abuse and the state sponsored organized crime actions further disrupted my sense of normal life and led to lasting psychological and emotional harm.

### 2. Financial Losses:

Malicious Prosecution Costs to Taxpayers: $6,000,000 - $8,000,000
Property Loss: $16,000
Annuity Interest Loss (8-12% from 2019-2023): $73,280 - $137,400
Rent Payment Loss (2020): $840
Cost to Evict Greg Weiss Interest Loss: $450
20% Taxes on Cost to Evict Greg Weiss: $600

Legal Cost: $3,600
Subtotal for Financial Losses: $6,090,570 - $8,163,190

## 3. Punitive Damages:
Punitive Damages: $500,000

## 4. Other Charges:
Garbage Chute Charge: $1,000
Subtotal for Other Charges: $1,000

## 5. Legal Fees:
Past Legal Fees (6 cases): $300,000
Future Legal Fees for Ongoing Cases and Appeals: $100,000
Medical Malpractice Legal Fees: $50,000 - $100,000
Legal Fraud and Identity Theft Legal Fees: $50,000
Subtotal for Legal Fees: $600,000 - $650,000

## 6. Medical Costs and Negligence:
Medical Malpractice and Negligence: $200,000
Loss of Medical Care: $100,000
Subtotal for Medical Costs: $300,000

Unable to pursue due to the malicious prosecution I endured. This resulted in the total disruption of any sense of normal life, including my ability to seek and receive proper medical care. The psychological toll of the ongoing prosecution has compounded my physical and emotional suffering, preventing me from recovering and leading a normal life.

## Updated Total High-End Estimate of Damages:
Low-End Total: $8,491,570
High-End Total: $11,487,290

Respectfully Done,
Wendy Drews
ACP 7037 P.O. Box 1110
Albany, N.Y. 12201-1110

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

WENDY MARIE DREWS,
Plaintiff,

v.

GOLDOLLAR REAL ESTATE INVESTMENTS;
LYNMARK GROUP – ORANGE AVENUE APARTMENTS, LLC, d/b/a THE SHELDON AT
SUFFERN STATION;
CARLA HINES MELCHER,
Defendants.

Case No.: **24-CV-6697 (LLS)**

## NOTICE REGARDING PLAINTIFFS AND PRESERVATION OF RIGHTS

Plaintiff Wendy Marie Drews respectfully submits this Notice pursuant to the Court's Order dated July 28, 2025, granting leave to replead.

While the original complaint listed Plaintiff's two children in the caption, one was a minor at the time of filing and could not appear pro se. Under **Fed. R. Civ. P. 17(c)**, a minor or incompetent person must be represented by a guardian ad litem, next friend, or appointed counsel, and Plaintiff understands she cannot represent them in this proceeding.

To comply with the Court's directive and to avoid unnecessary delay, Plaintiff proceeds at this time **solely on her own claims.**

This amendment is **not intended to waive, release, or otherwise prejudice** the independent rights of her now-adult child, who is free to bring any related claims in their own name pursuant to **Fed. R. Civ. P. 17** and **Fed. R. Civ. P. 19**, or other applicable law.

Nothing herein should be construed as an adjudication of, or limitation upon, the potential claims of that individual.

**Dated:** August 27, 2025
Respectfully submitted,

/s/

**Wendy Marie Drews**
Plaintiff, Pro Se
ACP 7037 P.O. Box 1110 Albany, New York 12201-111

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

WENDY MARIE DREWS,
Plaintiff,
v.
GOLDOLLER REAL ESTATE INVESTMENTS;
LYNMARK GROUP–ORANGE AVENUE APARTMENTS, LLC d/b/a THE SHELDON AT
SUFFERN STATION;
CARLA HINES-MELCHER,
Defendants.

Case No. 24-CV-6697 (LLS)

## PLAINTIFF'S REQUEST REGARDING EXHIBITS

Plaintiff, appearing pro se, respectfully submits this request in connection with her Second
Amended Complaint filed on [date].

1. Plaintiff has streamlined her Complaint to address the Court's prior guidance.
2. Plaintiff has prepared an Exhibit List but, as a pro se litigant, is not in a position to
   immediately submit all underlying exhibits at this time.
3. Plaintiff respectfully requests that if the Court requires the physical filing of all exhibits
   now, she be granted a brief extension of time to assemble and submit them.
4. If the Court is satisfied with the Second Amended Complaint and Exhibit List for present
   purposes, Plaintiff asks that the request for additional time be deemed unnecessary and
   dismissed as moot.

Respectfully submitted,

Dated: August 27, 2025
Wendy Marie Drews
Plaintiff, Pro Se
ACP 7037, P.O. Box 1110
Albany, NY 12201-1110

# Exhibits Index

**Wendy Marie Drews v. GoldOller Real Estate Investments, et al.**
Case No. 24-CV-6697 (LLS)
United States District Court, Southern District of New York

## Exhibit List

- **Exhibit A** – Body-worn camera transcript excerpts (Suffern PD, May 31, 2023).
- **Exhibit B** – Still frame photographs from BWC video (showing entry and camera deactivation).
- **Exhibit C** – CFPB Complaint filings and responses (false $49,000 debt reporting).
- **Exhibit D** – Credit bureau dispute letters and CRA responses.
- **Exhibit E** – NYS Division of Human Rights Complaint (re: Greg Weiss) and dismissal correspondence.
- **Exhibit F** – NYS Division of Human Rights Housing Discrimination Complaint and closure letter (2023).
- **Exhibit G** – ERAP approval notice and related eviction filings (late 2022–2023).
- **Exhibit H** – Affidavits/records of mental health evaluations (showing Plaintiff was not mentally ill).
- **Exhibit I** – Nurse Patricia Underwood's report and related CPS correspondence (May 23, 2023).
- **Exhibit J** – Photographs/video stills of surveillance and intimidation (including "POLICE" hat and white Mercedes).
- **Exhibit K** – Parking permit correspondence and Memorial Day weekend revocation evidence.
- **Exhibit L** – Correspondence with GoldOller/Lynmark management regarding harassment and safety concerns.
- **Exhibit M** – Email and notes showing stakeholder conflicts (Ed Day, DA Walsh, Suffern PD).
- **Exhibit N** – Photographs and documents regarding harassment by Greg Weiss and associates.
- **Exhibit O** – Correspondence with Yankwitt Law Firm and related filings.
- **Exhibit P** – Photographs of intimidation by male individuals in parking deck/white Mercedes.
- **Exhibit Q** – Screenshots of social media intimidation (Hunter Warfield and Goldstein family).
- **Exhibit R** – Witness statement from Plaintiff's son (re: harassment, CPS intimidation, May 31 seizure).

- **Exhibit S** – Law enforcement records of Greg Weiss's December 2020 arrest and January 2021 eviction.
- **Exhibit T** – Complaint filings in related Human Rights and Housing proceedings.
- **Exhibit U** – Supporting records regarding Plaintiff's co-op property theft (Michael Klein, related filings).
- **Exhibit V** – Public documents linking stakeholders and property ownership interests.
- **Exhibit W** – Any email or letter confirming the **pending open homicide investigation** (August 21, 2025).
- **Exhibit X** – Any additional relevant correspondence or filings (reserved for later supplement).

---

**Tip:** When you assemble your 35 files, just rename each as *Exhibit A, Exhibit B,* etc. and match to this list. If you discover more later, you can update the index and mark them *Exhibit Y, Exhibit Z,* etc., or add *Exhibit AA* going forward.

---

# Statement of Facts (Condensed)

**Plaintiff:** Wendy Marie Drews
**Defendants:** GoldOller Real Estate Investments; Lynmark Group–Orange Avenue Apartments, LLC (d/b/a The Sheldon at Suffern Station); and Carla Hines-Melcher

# 1. Background

1. Plaintiff is a documented domestic violence survivor and a tenant of *The Sheldon at Suffern Station* in Suffern, NY.
2. Defendants GoldOller, Lynmark, and Carla Hines-Melcher (property manager) engaged in a pattern of harassment, retaliation, and unlawful collusion with law enforcement and local officials.

# 2. Harassment and Retaliation

3. In 2019–2021, Plaintiff and her family were harassed by tenant Greg Weiss. Weiss was arrested in December 2020 and evicted in January 2021. Management failed to protect Plaintiff despite her warnings.
4. Plaintiff filed complaints with the NYS Division of Human Rights. At least one was dismissed after interference by Rockland County District Attorney Tom Walsh III, who told the agency "the county can't help you."
5. In 2022, the Suffern School District filed a false CPS report, later closed as unfounded. Plaintiff discovered her alias "Mrs. Davis" was misused in official filings, reinforcing a false narrative of instability.

# 3. Retaliatory Eviction and ERAP

6. Plaintiff received federal Emergency Rental Assistance Program (**ERAP**) approval in late 2022, which protected against eviction.
7. Despite these protections, Defendants refused to renew her lease in March 2023 and moved to evict her. This was done in retaliation for Plaintiff's complaints and litigation.

## 4. May 2023 Orchestration

8. On May 23, 2023, nurse Patricia Underwood filed a false CPS report against Plaintiff after Plaintiff requested counseling support.
9. Defendants targeted Plaintiff's teenage son through surveillance, illegal videotaping, and intimidation.
10. On Memorial Day weekend 2023, Defendant Hines-Melcher revoked Plaintiff's parking privileges, ensuring she would be away from the building on May 31.

## 5. May 31, 2023 Warrantless Entry

11. On May 31, 2023, Defendant Hines-Melcher unlocked Plaintiff's apartment door for Suffern police officers, who entered **without a warrant, court order, or exigent circumstances.**
12. Plaintiff's 16-year-old son was seized and removed into foster care for 142 days. Body-worn camera footage confirms collusion between Hines-Melcher and the officers.
13. The removal violated Plaintiff's **Fourth Amendment right to be free from unlawful searches and seizures** and her **Fourteenth Amendment right to family integrity.**

## 6. Financial and Credit Harm

14. In 2023–2024, Defendants (through debt collector Hunter Warfield) reported a false $49,000 debt to credit bureaus.
15. Plaintiff disputed the debt with CRAs and the CFPB. Defendants failed to investigate, violating the **Fair Credit Reporting Act (FCRA).**
16. The tradeline was eventually removed in August 2025, but only after significant damage to Plaintiff's credit.

## 7. Ongoing Retaliation (2024–2025)

17. In 2024–2025, Defendants and their associates engaged in further intimidation:
- Social media "friend" requests from Hunter Warfield and Goldstein family members.
- Threatening contact from Debra Goldstein.
- Surveillance and witness intimidation, including a man in a "POLICE" hat and a white Mercedes.

# 8. Newly Discovered Evidence

18. On August 21, 2025, Plaintiff learned that her mother's death in the late 1990s is the subject of a **pending open homicide investigation**.
19. This discovery suggests a longstanding pattern of harm and retaliation against Plaintiff's family, consistent with the racketeering scheme described in this case.

---

# 9. Summary

20. Defendants' conduct amounts to:
- **FCRA violations** (false tradeline, failure to investigate).
- **§ 1983 constitutional violations** (warrantless entry and seizure, deprivation of family integrity).
- **Fair Housing Act violations** (discrimination and retaliation against a DV survivor and single mother).
- **Civil RICO violations** (obstruction of justice, witness tampering, wire/mail fraud, extortion, kidnapping).
21. Plaintiff seeks compensatory, statutory, and punitive damages; declaratory and injunctive relief; and any other relief this Court deems just.

---

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

**WENDY MARIE DREWS,**
Plaintiff,

v.

**GOLDOLLER REAL ESTATE INVESTMENTS;**
**LYNMARK GROUP – ORANGE AVENUE APARTMENTS, LLC** (d/b/a *The Sheldon at Suffern Station*);
**CARLA HINES-MELCHER,**
Defendants.

Case No.: **24-CV-6697 (LLS)**

---

## LETTER MOTION FOR LEAVE TO FILE SECOND AMENDED COMPLAINT

Hon. Louis L. Stanton
United States District Judge
Southern District of New York

Dear Judge Stanton:

I respectfully request leave of Court to file a Second Amended Complaint. On **August 21, 2025,** I discovered new evidence that my mother's death, which occurred approximately 26 years ago, is now the subject of a **pending open homicide investigation.**

This newly discovered evidence suggests potential **serial patterns of misconduct and multiple suspicious deaths**, which provide important context for the pattern of retaliation, intimidation, and systemic misconduct already alleged in this case.

As a pro se litigant, I could not have included this material in the original or First Amended Complaint because it was not available until August 21, 2025. I therefore respectfully request an additional 30 days to compile the exhibits and integrate this evidence into a Second Amended Complaint. This request is made in good faith and not for the purpose of delay.

Respectfully submitted,

**Wendy Marie Drews**
Pro Se Plaintiff
ACP 7037
P.O. Box 1110
Albany, NY 12201-1110

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

**WENDY MARIE DREWS,**
Plaintiff,

v.

**GOLDOLLER REAL ESTATE INVESTMENTS;**
**LYNMARK GROUP – ORANGE AVENUE APARTMENTS, LLC** (d/b/a *The Sheldon at Suffern Station*);
**CARLA HINES-MELCHER,**
Defendants.

Case No.: **24-CV-6697 (LLS)**

NOTICE OF NEWLY DISCOVERED EVIDENCE AND REQUEST FOR LEAVE TO FILE SECOND AMENDED COMPLAINT

**TO THE COURT AND ALL PARTIES:**

Plaintiff, appearing pro se, respectfully submits this Notice to advise the Court of newly discovered evidence relevant to the issues in this case.

1. On **August 21, 2025**, Plaintiff discovered evidence that her mother's death, which occurred approximately 26 years ago, is now the subject of an **open homicide investigation**.
2. This evidence, arising only recently, suggests potential **serial patterns of misconduct and multiple suspicious deaths**, and may provide context for the pattern of retaliation, intimidation, and systemic misconduct alleged in this action.
3. Because this information was not available at the time of filing the Complaint or First Amended Complaint, Plaintiff could not have included it previously.
4. Plaintiff preserves this evidence on the record and respectfully **requests leave of Court to file a Second Amended Complaint** incorporating this new information. A [Proposed] Order granting leave is submitted herewith for the Court's consideration.

Date: _August 27, 2025_
Respectfully submitted,

**Wendy Marie Drews**
Pro Se Plaintiff

ACP 7037
P.O. Box 1110
Albany, NY 12201-1110

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

**WENDY MARIE DREWS,**
Plaintiff,

v.

**GOLDOLLER REAL ESTATE INVESTMENTS;**
**LYNMARK GROUP – ORANGE AVENUE APARTMENTS, LLC** (d/b/a *The Sheldon at Suffern Station*);
**CARLA HINES-MELCHER,**
Defendants.

Case No.: **24-CV-6697 (LLS)**

---

⊛ NOTICE OF NEWLY DISCOVERED EVIDENCE

## TO THE COURT AND ALL PARTIES:

Plaintiff, appearing pro se, respectfully submits this Notice to advise the Court of newly discovered evidence relevant to the issues in this case.

1. On **August 21, 2025**, Plaintiff discovered evidence that her mother's death, which occurred approximately 26 years ago, is now the subject of an **open homicide investigation**.
2. This evidence, arising only recently, suggests potential **serial patterns of misconduct and multiple suspicious deaths**, and may provide context for the pattern of retaliation, intimidation, and systemic misconduct alleged in this action.
3. Because this information was not available at the time of filing the Complaint or Amended Complaint, Plaintiff could not have included it previously.
4. Plaintiff preserves this evidence on the record for the Court's consideration. If the Court deems it appropriate, Plaintiff respectfully requests that leave be granted to file a Second Amended Complaint to incorporate this evidence formally.

---

Date: August 21, 2025
Respectfully submitted,

**Wendy Marie Drews**
Pro Se Plaintiff
ACP 7037

P.O. Box 1110
Albany, NY 12201-1110

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

**WENDY MARIE DREWS,**
Plaintiff,

v.

**GOLDOLLER REAL ESTATE INVESTMENTS;**
**LYNMARK GROUP – ORANGE AVENUE APARTMENTS, LLC** (d/b/a *The Sheldon at Suffern
Station*);
**CARLA HINES-MELCHER,**
Defendants.

Case No.: **24-CV-6697 (LLS)**

---

# Exhibits List in Support of Amended Complaint

The following exhibits are submitted in support of Plaintiff's Amended Complaint:

1. **Exhibit 1** – Body-Worn Camera (BWC) still frames and transcript excerpts, May 31, 2023 (showing Defendant Hines-Melcher present during unlawful entry).
2. **Exhibit 2** – Consumer Financial Protection Bureau (CFPB) decision letter regarding removal of $46,000 fabricated debt.
3. **Exhibit 3** – New York State Division of Human Rights complaint and 64-page rebuttal submission by Plaintiff.
4. **Exhibit 4** – Child Protective Services / Family Court records regarding unlawful removal and 142-day foster care placement.
5. **Exhibit 5** – Rockland County judgment record for $29,000 entered without Plaintiff's presence.
6. **Exhibit 6** – Eviction court filings and transcript excerpts showing ERAP retaliation.
7. **Exhibit 7** – Correspondence with Lynmark Group and GoldOller corporate offices demonstrating notice and failure to act.
8. **Exhibit 8** – Police report filed March 7, 2023, documenting harassment tied to ERAP issues.
9. **Exhibit 9** – Affidavits of five adult witnesses corroborating false statements about "privatized/poisoned water" and related harassment.
10. **Exhibit 10** – Quiet Title and Lis Pendens filings showing connection to related property theft/RICO matters.

11. **Exhibit 11** – Evidence of ongoing harassment and intimidation in 2025, including Hunter Warfield and Debra Goldstein contact.

---

Date: _August 27, 2025_

Respectfully submitted,

/s/

**Wendy Marie Drews**
Pro Se Plaintiff
ACP 7037
P.O. Box 1110
Albany, NY 12201-1110

---

# Exhibit Reference Key

- **Ex. 1** – May 31, 2023 Body-Worn Camera (BWC) stills & transcript excerpts (presence of Defendant Hines-Melcher during unlawful entry).
- **Ex. 2** – CFPB decision letter (removal of fabricated $46,000 debt entry).
- **Ex. 3** – NYS Division of Human Rights Complaint & Plaintiff's 64-page rebuttal (false statements rebutted).
- **Ex. 4** – CPS/Family Court records (unlawful child removal & 142-day foster placement).
- **Ex. 5** – Rockland County judgment record ($29,000 entered in Plaintiff's absence).
- **Ex. 6** – Eviction court filings & transcript excerpts (ERAP retaliation).
- **Ex. 7** – Correspondence with Lynmark Group & GoldOller corporate offices (notice ignored).
- **Ex. 8** – March 7, 2023 police report (ERAP harassment complaint).
- **Ex. 9** – Affidavits of five adult witnesses (false "poison water" claim).
- **Ex. 10** – Quiet Title & Lis Pendens filings (connected property theft/RICO overlap).
- **Ex. 11** – 2025 harassment/witness intimidation (Hunter Warfield & Debra Goldstein contact).

# UNITED STATES DISTRICT COURT

*Southern District of New York*

Awarded To

# Wendy Drews

For Completing the Court's CM/ECF Introduction

Course  Awarded the 19th of September 2024



Lourdes Aquino, Director of Miscellaneous Case Operations

Presenters Name and Title