UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

WENDY MARIE DREWS,

            Plaintiff,

-against-

GOLDOLLAR REAL ESTATE INVESTMENTS; LYNMARK GROUP-ORANGE AVENUE APARTMENTS, LLC, dba THE SHELDON AT SUFFERN STATION; CARLA HINES-MELCHER,

            Defendants.

24-CV-6697 (LLS)

ORDER OF DISMISSAL

LOUIS L. STANTON, United States District Judge:

    Plaintiff proceeds *pro se* and *in forma pauperis*. In Plaintiff's original complaint, she sued the property manager of her former apartment building, Carla Hines-Melcher, and private entities that owned or managed the rental building (GoldOller Real Estate Investments (GoldOller), the Lynmark Group-Orange Avenue Apartments, LLC (Lynmark)), asserting claims under 42 U.S.C. § 1983, the Violence against Women Act (VAWA), federal criminal statutes, 18 U.S.C. §§ 241, 1514, and 2261A, the Fair Credit Reporting Act (FCRA), 15 U.S.C. §§ 1681s-2(a) and (b), and state law. By order July 28, 2025, the Court dismissed the complaint with leave to replead. The Court cautioned Plaintiff not to add claims in the amended complaint that overlapped with claims that she had already raised in other pending actions.[1]

---

[1] *See, e.g., Drews v. Rockland Cnty. Officials*, No. 25-CV-2710 (LLS) (S.D.N.Y.) (complaint naming "judges," "police," "DSS workers" and others, dismissed with leave to replead); *Drews v. Greater Mental Health of N.Y.*, No. 24-CV-6699 (S.D.N.Y. Nov. 19, 2024) (complaint against medical providers conducting evaluation in connection with Family Court matters dismissed); *Drews v. Adams*, No. 24-CV-6698 (NSR) (S.D.N.Y.) (pending complaint asserting claims against Police Officer Adams regarding the removal on May 31, 2023, of Drews's then-minor son from her custody); *Drews v. Vill. of Suffern*, No. 24-CV-6696 (LLS) (SD.N.Y.) (amended complaint naming Suffern High School and others in Rockland County).

On August 27, 2025, Plaintiff filed an amended complaint, and the Court has reviewed it. Plaintiff sues the same Defendants named in her original complaint, and she asserts Section 1983 claims for alleged violations of her Fourth Amendment rights, as well as claims under the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961-1968, the FCRA, and the Fair Housing Act (FHA), for alleged discrimination against her as a survivor of domestic violence.

Plaintiff adds that she has learned that an investigation into the death of her mother in the 1990s is being reopened as a potential homicide investigation. Plaintiff asserts that this raises the possibility that her mother's death "could be linked (directly or indirectly) to the powerful individuals and entities now opposing Plaintiff," and she seeks further leave to amend to include this "newly discovered evidence." (ECF 13 at 52.) For the reasons set forth below, the Court dismisses the action and denies further leave to replead.

## STANDARD OF REVIEW

The Court must dismiss an *in forma pauperis* complaint, or portion thereof, that is frivolous or malicious, fails to state a claim on which relief may be granted, or seeks monetary relief from a defendant who is immune from such relief. 28 U.S.C. § 1915(e)(2)(B); *see Livingston v. Adirondack Beverage Co.*, 141 F.3d 434, 437 (2d Cir. 1998). The Court must also dismiss a complaint when it lacks subject matter jurisdiction. *See* Fed. R. Civ. P. 12(h)(3). While the law mandates dismissal on any of these grounds, the Court is obliged to construe *pro se* pleadings liberally, *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009), and interpret them to raise the "strongest [claims] that they *suggest*," *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006) (internal quotation marks and citations omitted).

## BACKGROUND

The following allegations are drawn from Plaintiff's amended complaint. Prior to 2019, Plaintiff's cooperative apartment was "illegally taken" from her, despite her continued occupancy, under the false pretense that it was "abandoned." (ECF 13 at 10.) Michael Klein, a former attorney in the Town of Ramapo who is not a party to this action, allegedly played some role in this "real estate fraud." (*Id.*)

Thereafter, in June 2019, Plaintiff moved into an apartment building known as The Sheldon at Suffern Station (The Sheldon), in Suffern, New York. (*Id.* at 9, ¶ 7.) The apartment building is owned by Defendants GoldOller and Lynmark (*id.* at ¶¶ 8-9), and Defendant Hines-Melcher worked as the property manager (*id.* at ¶ 10). Michael Klein and his associates allegedly have "direct connections" to the ownership and management of The Sheldon. (*Id.*)

In 2019, Greg Weiss, a neighboring tenant at The Sheldon, subjected Plaintiff and her sons to "severe harassment." (*Id.*) Police Officer Adams urged Plaintiff to sign a criminal complaint against Weiss, and on or about December 20, 2020, Weiss was arrested.[2] (*Id.*) On or about January 8, 2021, Weiss was evicted from the building. Plaintiff states that "[m]anagement failed to protect Plaintiff despite her warnings." (*Id.* at 46.) Plaintiff filed a formal administrative complaint with the New York State Division of Human Rights (DHR), detailing the alleged harassment and retaliation that she experienced at The Sheldon. DHR staff told Plaintiff that the Rockland County District Attorney, Tom Walsh III, had directed the DHR to discontinue its investigation into Plaintiff's claims.

---

[2] Plaintiff has a separate suit against Officer Adams, *Adams*, No. 24-CV-6698 (NSR).

3

In 2022, the Suffern Central School District filed the first allegedly false Child Protective Services (CPS) report against Plaintiff, expressing concern for the welfare of one of her sons.[3] In late 2022, Plaintiff's financial situation deteriorated due, in part, to the "ongoing harassment" and related legal battles. (*Id.* at 13.) In November 2022, Plaintiff was approved to receive rental assistance through New York's Emergency Rental Assistance Program (ERAP), which provided relief to tenants during the COVID-19 pandemic. Plaintiff states that, under ERAP, she was entitled to seek a longer stay of eviction because her minor child resided in the household. On March 7, 2023, Plaintiff paid charges of $4200 that were not covered by ERAP. Despite this, Defendants did not offer Plaintiff a lease renewal, and on an unspecified date, the landlord commenced eviction proceedings against her.

Between May 18, 2023 and May 24, 2023, the Suffern Central School District filed another false CPS report against Plaintiff. On May 23, 2023, Nurse Patricia Underwood filed a CPS report against Plaintiff, raising concerns about her alleged mental instability and the risk to Plaintiff's child; Plaintiff alleges that the timing suggests that Underwood was coordinating with The Sheldon's property manager, Hines-Melcher. (*Id.* at 14.)

On May 31, 2023, while Plaintiff was away, Defendant Hines-Melcher, "acting in concert" with several officers of the Suffern Police Department and child welfare officials, facilitated entry into Plaintiff's apartment and "seizure" of her 16-year-old son. Plaintiff alleges that the officials had a "piece of paper" purporting to allow a "welfare check" or entry, but that it

---

[3] These allegations about the Suffern Central School District are the basis of Plaintiff's claims in *Drews v. Suffern High Sch.*, No. 24-CV-6696 (LLS) (S.D.N.Y.). Plaintiff has not named any defendant in this action in connection with these claims, and the Court therefore does not address these allegations in its analysis.

did not authorize taking the child into custody.[4] Plaintiff's son was transferred to the custody of Rockland County CPS, and he spent the next 142 days in foster care.

In summer 2024, non-party Hunter Warfield, Inc. ("HW"), a debt collector, reported to credit bureaus that Plaintiff owed $49,000 in rental arrears and fees. (*Id.* at 17.) Plaintiff disputed this debt with the consumer reporting agencies and, in fall 2024, filed a complaint with the federal Consumer Financial Protection Bureau (CFPB). On July 31, 2025, Plaintiff received a message from an HW affiliated account "attempting to 'connect' with her." (*Id.*) Debra Goldstein, who is linked to Defendants GoldOller and Lynmark, also contacted Plaintiff; Plaintiff contends that for Goldstein to do so "while Plaintiff was actively pursuing her rights in court" constituted witness tampering and retaliation in violation of federal criminal law, 18 U.S.C. §§ 1512-1513; this is allegedly one of the "predicate acts" supporting Plaintiff's RICO claims. In August 2025, "the furnisher" of information to the consumer reporting agencies (either HW or one or more of the Defendants) removed the debt from Plaintiff's consumer report. Plaintiff alleges, however, that "the damage to Plaintiff's credit was done" and that this had "hinder[ed] her ability to secure new housing or credit." (*Id.*)

Plaintiff contends that she is protected under the federal FHA as a survivor of domestic violence and a parent of minor children. She asserts that she is a person with "familial status" as defined by 42 U.S.C. § 3602(k). In support of her FHA claim, Plaintiff further alleges

---

[4] In Plaintiff's action against a police officer arising from the same incident, *Adams*, No. 24-CV-6698 (NSR), Plaintiff attaches to the complaint a police report stating that on May 26, 2023, Judge Tanguay of the Rockland County Family Court issued an Order on Application for Access to Child and Home. (ECF 1 at 23.) According to this narrative, the order authorized a "child protective investigator to enter the home and provide access to the child" and "ORDERED that the local police agency is to provide assistance to the child protective investigator in entering the home, if necessary." (*Id.*) The report states that Police Officer Abigail Adams "advised Hines that there was a valid court order issued which ordered access to [the child] and his home (Apt. 605)." (*Id.*)

> Defendants were aware of Plaintiff's protected status: they knew Plaintiff had a teenage son living with her, and they knew from Plaintiff's disclosures and the Address Confidentiality Program granted after these crimes by them that she was a prior victim of domestic abuse. Additionally, Plaintiff engaged in activities protected under fair housing law, including requesting reasonable security measures, applying for rental assistance, and filing civil rights complaints about Defendants' conduct.

(*Id.* at 23.)

Plaintiff contends that Defendants "aggressively pursu[ed] her eviction despite her ERAP protection," "refus[ed] to renew Plaintiff's lease," denied her parking privileges, and created a hostile housing environment by failing to intervene adequately with tenant Greg Weiss. (*Id.*) Moreover, Defendant Hines-Melcher allegedly targeted Plaintiff based on her gender and familial status by accusing her of being "insane" or a "bad mother." (*Id.*)

Plaintiff thus alleges that Defendants GoldOller, Lynmark, and Hines-Melcher engaged in a multi-year pattern of harassment, discrimination, and retaliation, which culminated in the removal of Plaintiff's son by CPS, eviction proceedings, and non-renewal of her lease. Plaintiff seeks damages.

## DISCUSSION

### A.   Fourth and Fourteenth Amendment Claims

Plaintiff sues Property Manager Hines-Melcher, under Section 1983, for allegedly violating her constitutional rights under the Fourth and Fourteenth Amendment to the United States Constitution. As explained in this Court's July 28, 2025 order, to state a claim under Section 1983, a plaintiff must allege that a person acting under the color of state law, or a "state actor," violated a right secured by the Constitution or laws of the United States. *West v. Atkins*, 487 U.S. 42, 48-49 (1988); *Ciambriello v. Cnty. of Nassau*, 292 F.3d 307, 323 (2d Cir. 2002) ("[T]he United States Constitution regulates only the Government, not private parties. . . .").

6

To satisfy the state action requirement, a claim for relief under Section 1983 must allege facts showing that each defendant acted under the color of a state "statute, ordinance, regulation, custom or usage." 42 U.S.C. § 1983. Private parties therefore generally are not liable under the statute. *Sykes v. Bank of Am.*, 723 F.3d 399, 406 (2d Cir. 2013) (citing *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295 (2001)).

As set forth in the Court's July 28, 2025 order, "a private actor acts under color of state law when the private actor 'is a willful participant in joint activity with the State or its agents.'" *Betts v. Shearman*, 751 F.3d 78, 84 (2d Cir. 2014) (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 152 (1970)). For a private actor to be "a willful participant in joint activity with the State or its agents," the two must share some common goal to violate the plaintiff's rights. *Id.* at 85 (citation omitted). By contrast, where government employees act independently of the private party, there is no joint action. *See Ginsberg v. Healey Car & Truck Leasing, Inc.*, 189 F.3d 268, 272 (2d Cir. 1999) ("Where . . . a police officer exercises independent judgment . . ., the private party is not 'jointly engaged' in the officer's conduct so as to render it a state actor under Section 1983.").

Here, Hines-Melcher is alleged to be employed as a property manager for a private rental building. Plaintiff alleges that police officers had "a paper purporting to authorize a welfare check or entry" and that Hines-Melcher "willfully participated" by "unlocking Plaintiff's apartment door for officers of the Suffern Police Department" and Rockland County CPS employees. (ECF 13 at 16.) Hines-Melcher allegedly "engaged in joint action and conspired with state actors (including officers of the Suffern Police Department and other government agents) to accomplish the unlawful entry into Plaintiff's home and seizure of her child." (*Id.* at 23.)

> Plaintiff argues that
>
> > the officers shared a mutual understanding and meeting of the minds: to remove Plaintiff's son regardless of legal authorization. The coordination between Hines-Melcher and the officers is evidenced by, *inter alia*, their recorded conversations and the officers' deliberate deactivation of body cameras while conferring with Hines-Melcher.
> >
> > . . .
> >
> > [Police Officer Adams] deliberately turned off her body-worn camera at multiple pivotal moments that day, particularly during private discussions with Hines-Melcher in the building lobby and hallway. These gaps in video coincide with periods when Hines-Melcher and the officers were deciding how to proceed without legal authority. The intentional deactivation of the camera strongly suggests a consciousness of wrongdoing and an attempt to prevent the creation of evidence. Notably, as soon as the officers had removed Plaintiff's son and brought him to the lobby, officer can be seen on video walking into a doorway and then the footage stops immediately before Hines-Melcher is observed whispering to that officer off the record. This collusion between Hines-Melcher and the police is a linchpin of Plaintiff's case: it demonstrates a meeting of the minds between a private actor (the property manager) and state actors (the police) to violate Plaintiff's constitutional rights.

(*Id.* at 21.)

Although Plaintiff makes conclusory assertions that Hines-Melcher was engaged in joint action, the only factual support for this is Plaintiff's allegation that there were gaps in body-camera video and that this occurred in moments when officers were speaking with Hines-Melcher. These allegations are insufficient to give rise to an inference that the parties shared some common goal to violate Plaintiff's rights. Plaintiff thus does not allege facts sufficient to plead that Hines-Melcher was a state actor for purposes of a Section 1983 claim for a violation of the Fourth Amendment, or that Hines-Melcher conspired to violate Plaintiff's constitutional rights. Plaintiff's Section 1983 claims against Hines-Melcher for violating Plaintiff's constitutional rights must therefore be dismissed for failure to state a claim on which relief can be granted. 28 U.S.C. § 1915(e)(2)(B)(ii).

B.     Fair Credit Reporting Act

The FCRA imposes duties on furnishers of credit information to a consumer reporting agency ("CRA") that are codified at 15 U.S.C. §§ 1681s–2(a) and (b). An individual plaintiff cannot sue for a violation of 15 U.S.C. § 1681s-2(a), which governs furnishers' duties to report accurate information to a CRA. *Longman v. Wachovia Bank, N.A.*, 702 F.3d 148, 151 (2d Cir. 2012) ("[T]here is no private cause of action for violations of Section 1681s-2(a)."). Plaintiff therefore cannot state a claim under Section 1681s-2(a) for the alleged reporting of an inaccurate $49,000 debt.

Subsection (b) governs furnishers' duties of investigation once notice is received from a CRA that there is a dispute as to the completeness or accuracy of information furnished. An individual plaintiff can sue a furnisher of information, under Section 1681s-2(b), for failure to conduct a reasonable investigation. *Comunale v. Home Depot, U.S.A., Inc.*, 328 F. Supp. 3d 70, 80 (W.D.N.Y. 2018) (noting that the FCRA "does provide for a private cause of action pursuant to § 1681s-2(b)."). "To state a claim [under Section 1681s–2(b)(1)], a consumer must show that (1) a furnisher received notice of a credit dispute from a [CRA] (as opposed to from the consumer alone) and (2) the furnisher negligently or willfully failed to conduct a reasonable investigation." *Jackling v. HSBC Bank USA, N.A.*, No. 15-CV-6148 (FPG), 2019 WL 162743, at *4 (W.D.N.Y. Jan. 10, 2019).

The question of what it means to conduct a reasonable investigation "is not a complicated one." *Suluki v. Credit One Bank, NA*, 138 F.4th 709, 720 (2d Cir. 2025). "[A] reasonable procedure is one 'that a reasonably prudent person would undertake under the circumstances.'" *Id.* (quoting *Seamans v. Temple Univ.*, 744 F.3d 853, 864 (3d Cir. 2014)). "This inquiry is fact-dependent and turns in part on 'what [the furnisher] learned about the nature of the dispute from the description in the CRA's notice of dispute.'" *Id.* (quoting *Frederick v. Capital One Bank*

9

*(USA), N.A.*, No. 14-CV-5460 (AJN), 2018 WL 1583289, at *7 (S.D.N.Y. Mar. 27, 2018) (alteration in original)). The FCRA does not require that a furnisher of information delete a consumer's disputed account; rather, it "simply requires the furnisher of information to investigate and to report information from the investigation." *Ritchie v. N. Leasing Sys., Inc.*, No. 12-CV-4992 (AKH), 2016 WL 1241531, at *17 (S.D.N.Y. Mar. 28, 2016).

Plaintiff seems to suggest that non-party HW's investigation was unreasonable because of delay in deleting the rental-arrears debt after she disputed the debt. She alleges the following:

> In the Summer of 2024, Plaintiff discovered that a very large and derogatory item had appeared on her personal credit reports. A debt collector and/or furnisher of credit information (specifically, Hunter Warfield, Inc., acting on behalf of Defendants or the property) reported that Plaintiff owed approximately $49,000 in rental arrears or fees. Plaintiff promptly disputed the false credit information with the consumer reporting agencies (CRAs) as provided under the Fair Credit Reporting Act. In Fall 2024, after receiving no relief from direct disputes, Plaintiff escalated the matter by filing a complaint with the federal Consumer Financial Protection Bureau (CFPB) about the inaccurate credit reporting and Defendants harassment. In response, the CRA notified the furnisher (Defendants or their agent) of the dispute, triggering the furnisher's duty to investigate. This being on Plaintiff's credit file, causing her credit score to plummet and hindering her ability to secure new housing or credit. It was only after regulatory pressure and what the furnisher dubiously characterized as "harassment" by Plaintiff in insisting on her rights that the furnisher finally removed the tradeline immediately, in August 2025. By then, the damage to Plaintiff's credit was done. Defendants' malicious reporting is another facet of their retaliation, aiming to ruin Plaintiff's financial reputation as punishment for standing up to them.

(ECF 13 at 17.)

Thus, Plaintiff alleges that, after her complaint to a federal agency (the CFPB), on an unspecified date, the CRA "notified the furnisher (Defendants or their agent) of the dispute," and "the furnisher finally removed the tradeline immediately, in August 2025." (*Id.*) Although Plaintiff's claim that the investigation was unreasonable appears to be premised on the argument that there was undue delay, she does not include facts about the length of any alleged delay; it is also unclear when Plaintiff notified the CRA, when the CRA notified the furnisher of

10

information (or who was notified), or what the CRA included in its notice of dispute. Plaintiff's allegations show only that after she notified the CRA, someone removed the information from her consumer report. These allegations are insufficient to allege that any Defendant (or non-party HW) failed to conduct a reasonable investigation. Plaintiff's claim under Section 1681s–2(b)(1) is therefore dismissed for failure to state a claim on which relief may be granted. *See* § 1915(e)(2)(B)(ii).

**C.    RICO**

To state a claim for damages under RICO, a plaintiff has two pleading burdens. *See Moss v. Morgan Stanley Inc.*, 719 F.2d 5, 17 (2d Cir. 1983). First, a plaintiff must allege that the defendant has violated the substantive RICO statute, 18 U.S.C. § 1962, commonly known as "criminal RICO," by alleging the following elements: (1) that the defendant (2) through the commission of two or more acts (3) constituting a "pattern"  (4) of "racketeering activity" (5) directly or indirectly invests in, or maintains an interest in, or participates in (6) an "enterprise" (7) the activities of which affect interstate or foreign commerce. *Id*. (citing § 1962(a)-[c]). Second, to invoke RICO's civil remedies of treble damages, a plaintiff must further allege that the plaintiff was "injured in his business or property by reason of a violation of section 1962." 18 U.S.C. § 1964(c); *see Med. Marijuana, Inc. v. Horn*, 604 U.S. 593, 601-604 (2025).

In addition, the RICO conspiracy provision, 18 U.S.C. § 1962(d), makes it "unlawful for any person to conspire to violate any of the provisions of" § 1962(a), (b), or (c). *Cofacredit, S.A. v. Windsor Plumbing Supply Co.*, 187 F.3d 229, 244 (2d Cir. 1999). To establish a RICO conspiracy claim, a plaintiff must allege facts showing that the defendants "agreed to form and associate themselves with a RICO enterprise and that they agreed to commit two predicate acts in furtherance of a pattern of racketeering activity in connection with the enterprise." *Id.*

11

>Plaintiff makes the following allegations regarding the alleged enterprise:
>
>The enterprise described includes Defendants GoldOller Real Estate Investments and Lynmark Group-Orange Avenue Apartments, LLC, their management and employees (such as Defendant Hines-Melcher and other staff like "Bekim L." mentioned in Plaintiff's prior pleadings), and other collusive actors in the community (including but not limited to certain local officials, a private security company, and individuals like Joshua T. Goldstein, Jacqueline Goldman, Michael Klein, and Debra Goldstein who have been identified as part of Defendants' network).

(ECF 13 at 2.)

>She identifies the racketeering acts as follows:
>
>From at least 2019 through 2025, Defendants committed multiple racketeering acts, as defined in 18 U.S.C. § 1961(1) . . .
>
>[Defendants] interfered with the due administration of justice by causing evidence (such as the Weiss arrest record and other complaints) to be sealed or suppressed, and by tampering with witnesses. For example, Defendants orchestrated the removal of Plaintiff's son a material witness thereby preventing him from testifying on Plaintiff's behalf. They also intimidated Plaintiff through surveillance (*e.g.*, illegal video recordings and the presence of the "POLICE" hat individual) and through direct threats (*e.g.*, Debra Goldstein's August 2025 contact) to deter her from pursuing legal remedies.

(*Id.* at 2.)

Plaintiff further alleges that "Defendants engaged in multiple acts of fraud using the U.S. mails and interstate wires," including transmitting false information to credit reporting agencies (*id.* at 2), and engag[ing] in "Kidnapping and Abduction" (*id.* at 25), by which she means "[t]he unlawful seizure of Plaintiff's son on May 31, 2023," (*id.*).

Plaintiff's allegations of misconduct are insufficient to plausibly allege predicate acts committed as part of an ongoing criminal enterprise. For example, CPS's removal of Plaintiff's son, however distressing, does not satisfy the definition of a criminal kidnapping or abduction. Moreover, no facts are alleged that plausibly give rise to an inference that the investor-owners of the Sheldon had a meeting of the minds with "other collusive actors," as Plaintiff asserts. (ECF

12

13 at 2.) The allegations of the amended complaint show neither a pattern of racketeering activity nor a conspiracy in furtherance of racketeering. Plaintiff's RICO claims must therefore be dismissed for failure to state a claim on which relief may be granted. § 1915(e)(2)(B)(ii).

### D.     Fair Housing Act claims

The FHA "broadly prohibits discrimination in housing . . . ." *Gladstone Realtors v. Vill. of Bellwood*, 441 U.S. 91, 93 (1979). The FHA also prohibits retaliation against persons who have asserted their rights under the FHA. *See* 42 U.S.C.§ 3617. As explained below, the amended complaint does not allege facts sufficient to plead discrimination or retaliation in violation of the FHA.

#### 1.     Discrimination in violation of the FHA

The FHA prohibits the refusal "to sell or rent . . ., or . . . negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status, or national origin," 42 U.S.C. § 3604(a), or disability, § 3604 (f)(1). The FHA also prohibits discrimination because of membership in these classes "in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities," § 3604(b), (f)(2).

Generally, to state a claim of intentional discrimination under the FHA, a plaintiff must allege facts showing that she is "'a member of a protected class,' suffered relevant 'adverse' treatment, and '. . . [she must sustain] a *minimal* burden of showing facts suggesting an inference of discriminatory motivation.'" *Palmer v. Fannie Mae*, 755 Fed. App'x 43, 45 (2d Cir. 2018) (summary order) (quoting *Littlejohn v. City of New York*, 795 F.3d 297, 311 (2d Cir. 2015) (footnote omitted)). "'[A] plaintiff need only give plausible support to a minimal inference of discriminatory motivation' at the pleading stage." *Palmer*, 755 Fed. App'x at 45-46 (quoting *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 84 (2d Cir. 2015)); *see Saint-Jean v.*

*Emigrant Mortg. Co.*, 129 F.4th 124, 153 (2d Cir. 2025) ("An FHA plaintiff can show . . . intentional discrimination . . . without having to establish that the defendant was motivated by hatred, dislike, or bias."); *MHANY Mgmt., Inc. v. Cnty. of Nassau*, 819 F.3d 581, 616 (2d Cir. 2016) ("[I]f one of the motivating factors for an act was unlawful, the act violated the FHA.").

Plaintiff's allegations are insufficient to give rise to an inference that any adverse actions by Defendants, such as the eviction proceedings or non-renewal of her lease, were motivated by her familial status. Plaintiff describes herself as a domestic violence survivor who had escaped from "an abusive marriage and prolonged ten-year divorce" before moving to the Sheldon. (ECF 13 at 37.) Although Plaintiff alleges that Defendants, particularly Hines-Melcher, were aware of her prior domestic abuse, there are no allegations in the amended complaint giving rise to any inference that Plaintiff's status as a survivor of marital abuse played a role in the eviction, the non-renewal of Plaintiff's lease, or anything else that might be deemed an adverse action on the part of Defendants. The Court therefore dismisses Plaintiff's claims of discrimination under the FHA for failure to state a claim on which relief may be granted. *See* § 1915(e)(2)(B)(ii).

2. **Retaliation for protected activity**

To state a claim of retaliation under the FHA, a plaintiff must allege that she:

> (1) . . . engaged in protected activity by opposing conduct prohibited under the FHA; (2) that defendants were aware of that activity; (3) that defendants subsequently took adverse action against plaintiffs; and (4) that a causal connection exists between the protected activity and the adverse action, i.e., that a retaliatory motive played a part in the adverse action.

*Lynn v. Vill. of Pomona*, 373 F. Supp. 2d 418, 432 (S.D.N.Y. 2005), *aff'd*, 212 F. App'x 38 (2d Cir. 2007) (summary order).

"Protected activity under the FHA refers to action taken to protest or oppose statutorily prohibited discrimination, *i.e.*, retaliating because a person made a complaint, testified, assisted, or participated in any manner in a proceeding under the FHA." *Paladino v. Beaumont*, No. 20-

14

CV-0065, 2023 WL 9469277, at *4 (W.D.N.Y. Sept. 1, 2023), *report & recommendation adopted*, 2024 WL 343308 (W.D.N.Y. Jan. 29, 2024).

Plaintiff's amended complaint does not include facts suggesting that Plaintiff engaged in protected activity by opposing conduct prohibited under the FHA, that Defendants were aware of any protected activity, or that a causal connection exists between protected activity and any adverse action. The Court therefore dismisses Plaintiff's claims of retaliation under the FHA for failure to state a claim on which relief may be granted. *See* § 1915(e)(2)(B)(ii).

**E.     State law claims**

Once the district court "has dismissed all claims over which it has original jurisdiction," the court may decline to exercise supplemental jurisdiction of state law claims. 28 U.S.C. § 1367(c)(3). Generally, "when the federal-law claims have dropped out of the lawsuit in its early stages and only state-law claims remain, the federal court should decline the exercise of jurisdiction." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988)).

Having dismissed the federal claims of which the Court has original jurisdiction, the Court declines to exercise its supplemental jurisdiction of any state law claims that Plaintiff may be asserting. *See Kolari v. New York-Presbyterian Hosp.*, 455 F.3d 118, 122 (2d Cir. 2006) ("Subsection (c) of § 1367 'confirms the discretionary nature of supplemental jurisdiction by enumerating the circumstances in which district courts can refuse its exercise.'" (quoting *City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156, 173 (1997))).

**LEAVE TO AMEND**

District courts generally grant a *pro se* plaintiff leave to amend a complaint to cure its defects, but leave to amend may be denied if the plaintiff has already been given an opportunity to amend but has failed to cure the complaint's deficiencies. *See Ruotolo v. City of New York*, 514 F.3d 184, 191 (2d Cir. 2008); *Salahuddin v. Cuomo*, 861 F.2d 40, 42 (2d Cir. 1988). Because

15

Plaintiff's amended complaint gives no indication that the defects can be cured with a further amendment, the Court declines to grant Plaintiff another opportunity to amend.

## CONCLUSION

Plaintiff's federal claims are dismissed, pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii), and the Court declines to exercise supplemental jurisdiction of her state law claims, 28 U.S.C. § 1367(c)(3).

The Court directs the Clerk of Court to terminate all pending motions and enter judgment dismissing this action for the reasons set forth in this order.

SO ORDERED.

Dated:   February 25, 2026
         New York, New York

*Louis L. Stanton*
Louis L. Stanton
U.S.D.J.